UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| SANDRA RODRÍGUEZ COTTO; RAFELLI GONZÁLEZ COTTO,<br><br>*Plaintiffs*,<br><br>v.<br><br>WANDA VÁZQUEZ GARCED, Governor of Puerto Rico; DENNISE NOEMÍ LONGO QUIÑONES, Secretary of Department of Justice of Puerto Rico; PEDRO JANER, Secretary of Puerto Rico Department of Public Safety; HENRY ESCALERA, Puerto Rico Police Commissioner, all in their official capacities,<br><br>*Defendants*. | Civil Action No. _____ |

## DECLARATION OF SANDRA RODRÍGUEZ COTTO

I, Sandra D. Rodríguez Cotto, declare as follows:

1. I am a resident of Guaynabo, Puerto Rico.

2. I am 50 years old and competent to make this declaration.

3. I am an independent journalist with over 30 years of experience in print, television, magazines, radio and digital media in Puerto Rico, the United States and several Latin American countries. I am also a Public Relations Professional, licensed in Puerto Rico.

**I.  Professional Experience**

4. Currently, I host the syndicated radio program "En Blanco y Negro con Sandra" that airs daily, Monday to Friday, at 1 PM on at least 11 broadcast and online radio stations throughout Puerto Rico. Since 2010, I have published a blog by the same name, "En Blanco y

1

Negro con Sandra," where I feature my own news stories, in-depth reporting, and analysis of the media and politics. The blog is online at: https://enblancoynegromedia.blogspot.com/. I also have a weekly Facebook live program that includes investigative journalism, news, and analysis of current issues.

5. For over 16 years I was a weekly columnist for several local and international media. Most recently, I was a columnist for local newspaper El Vocero and the digital news site NotiCel, for which I have received several journalism awards.

6. My previous experience includes being a reporter for El Nuevo Día newspaper as an Investigative Unit reporter and special correspondent in the Caribbean region; TV producer and head of Investigations at Wapa TV; business reporter at Caribbean Business; and reporter at Univision Network (Miami) and Telemundo Channel 47 (New York). I have also been a regular contributor to US news outlets such as *BuzzFeed*, *Huffington Post*, *All Digitocracy*, *Diario La Prensa*, *Diario La Opinión (Los Ángeles)*, *The Miami Herald*, and publications in Latin America such as *Diario de Cuba*, *La Reforma (Mexico)*, and the *Red de Relacionistas de América Latina*, based in Argentina.

7. From 2004 to 2013, I created and ran a public relations firm with former reporter Pepo García called Avant Communications. In 2013, I established Joy PR, Inc. as a sole-proprietor communications consulting and public relations firm.

8. I have published several books on communication and journalism including "*Frente a los medios*" ("Facing the media") (2014), the collection of essays and columns "*En Blanco y Negro con Sandra*" ("In Black and White") (2016), and "Bitácora de una transmisión radial" ("Radio transmission log") (2018) about what happened at the only radio network that remained on the air during and after Hurricane Maria in Puerto Rico.

9. Some of my essays have been published in anthologies such as "*Crónicas de María*" (2018) (Chronicles about Maria), "*La maestra yanqui*" (2018), Aftershocks *of the Disaster: Puerto Rico Before and After the Storm*" (2019), and the four year-long investigation "*Journalism in colonial settings: the last colony of the Hemisphere*" as co-author with Professors Federico Subervĺ and Jairo Lugo-Ocando from the School of Media and Communication at the University of Leeds (England).

10. In 2019, I received the Bolívar Pagán National Literature and Journalism Award from the Institute of Puerto Rican Literature.

## II. Experience with Puerto Rico's Criminal Defamation Law

11. While I was serving as President of the Overseas Press Club in 1999–2000, we went to court to help defend Obed Betancourt and the newspaper *El Vocero* against a prosecution under Puerto Rico's former criminal defamation law for articles Mr. Betancourt published describing police corruption. At the probable cause hearing, the prosecution did not attempt to demonstrate that the defendants knew the reporting to be false, or even that the reporting contained any false information. The prosecution was dismissed for lack of probable cause.

12. The Overseas Press Club then sought to intervene in a federal lawsuit challenging Puerto Rico's criminal defamation law. Although our motion to intervene was denied, the law was ultimately struck down by the U.S. Court of Appeals for the First Circuit, on the ground that it violated the First Amendment. *Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003).

13. My experience with these lawsuits demonstrated to me the danger of allowing the government to prosecute speech that it deems to be false.

## III. Investigative Reporting: Hurricane Maria

3

14. In 2017, I was part of the historic coverage of Hurricane Maria in the only radio network that remained on the air, Cadena WAPA Radio. Broadcasting during and after the storm, WAPA Radio provided news and information to residents across the island, most of whom had lost electricity and could not access television, internet news, or print journalism.

15. Reporting by me and other journalists revealed the inadequacy of the response by the U.S. and Puerto Rico governments to the widespread devastation left by Hurricane Maria. Local officials, including then-Governor Ricardo Rosselló, repeatedly failed to provide credible information about the scale of the impact of the hurricane, claiming for months that the death toll was a few dozen, when in reality it was a few thousand.

16. I became known for asking government officials tough questions about the hurricane's impact and the government response. Officials were visibly upset by my questions and I was put on a "black list" of reporters who would not receive answers during press conferences.

17. During an on-air interview, I challenged then-Chief of Staff Ramón Rosario about the implausibility of the official death toll, and he responded by insulting me. He yelled at me, told me in the air that I was exaggerating, that I was crazy and launched several epithets, he raised his voice, and almost yelled at me in trying to shut me up, to the point that fellow journalist Luis Penchi had to intervene. Penchi entered the studio and on the air said that he would not tolerate any disrespect to any journalist and that Rosario had to calm down. Immediately following that interview I received thousands of messages via social media, many of them racist and misogynistic. The online bullying continued for months.

18. On November 2, 2017 my house was burglarized under suspicious circumstances. My personal and financial documents were strewn across the floor, but nothing was taken. I filed

a complaint with the police, who told me that the burglary was likely intended to "send a message."

19. As a result of the break-in and persistent online bullying, I decided to leave WAPA Radio and kept a relatively low profile. I continued to write columns questioning the government's response to the hurricane, many of which were very widely read.

20. Eventually, the government's mismanagement of the response to Hurricane Maria was widely recognized, but only after journalists like me were publicly ridiculed and threatened for trying to reveal the truth. It continues to be difficult to attract clients to my public relations firm because of the government's hostility towards me.

### IV.     Investigative Reporting: "Chat-gate"

21. On July 10, 2019, I revealed on my blog the first 11 pages of a Telegram chat between then-Governor Ricardo Rosselló and his aides. I focused my reporting on the use of misogynistic language and descriptions of violence against women in the chat. Over the next three days, I published over 50 more pages of the chat and the articles went viral. My reporting was picked up by media outlets across the world, including *The New York Times*, *The Guardian*, *Vice*, *MTV*, *Christian Science Monitor*, and many others.

22. The coverage of the Governor's chats led to island-wide protests against the government. Four days after my initial report, the Center for Investigative Journalism published 889 pages of the chat revealing additional inappropriate content. Thousands of people protested in the streets of Puerto Rico day in and day out, venting their frustration about government corruption and incompetence. After two weeks of protests, Governor Rosselló resigned.

23. During the two weeks of intense protests, I continued to update my blog and host my radio program. I published more than 100 additional pages of the original Telegram chat and

another chat involving then-Justice Secretary and now Governor Wanda Vázquez who refused to investigate corruption allegations against former first lady Beatriz Rosselló.

24. Since Governor Rosselló resigned, I have continued investigating and reporting on the government, and I remain a target of online trolling in response to my reporting to this day.

## V.     Fear of Prosecution under 25 L.P.R.A. §§ 3654(a) and (f)

25. I continue to engage in investigative reporting and commentary on my radio program and my blog. Like many other journalists in Puerto Rico, my reporting right now focuses on the public health emergency caused by the COVID-19 global pandemic and the government's response to that emergency.

26. I recently learned about the government's attempt to prosecute Pastor José Luis Rivera Santiago under 25 L.P.R.A. § 3654(a) for allegedly sharing false information about a rumored executive order to close all businesses because of the public health emergency. This prosecution reminds me of the attempts to prosecute journalists under the old criminal defamation law.

27. I am very concerned that I will be targeted for prosecution under 25 L.P.R.A. §§ 3654(a) and (f) for my reporting. I make every effort to confirm the accuracy of my reporting and commentary, in accordance with standard journalistic practices. But I also recognize that it is always possible that my reporting may contain inadvertent inaccuracies, especially during fast developing stories about public emergencies, or that the government may dispute the accuracy of my reporting, as it did regarding the death toll from Hurricane Maria.

28. My fear of prosecution under 25 L.P.R.A. §§ 3654(a) and (f) has chilled my own reporting and commentary.

29.     My sources have also refrained from sharing important information with me, because they are afraid that they too could be prosecuted under 25 L.P.R.A. §§ 3654(a) and (f).

30.     25 L.P.R.A. §§ 3654(a) and (f) purport to target what the government calls "fake news," but these laws are a threat to all reporting. It is already risky for journalists to challenge the government and now we risk a criminal conviction if anything we publish is eventually disproved, even if the error was unintentional. These laws allow the government broad discretion to harass and punish journalists. Now, journalists could face prison time if we publish material that has not been verified by the government.

31.     I also do not know what these laws mean when they make it a crime to report on "abnormalities" or what constitutes an intent to cause "confusion, panic, or public hysteria." I do not know whether my reporting could fall into these categories if the government concludes that it contains false information. For example, I do not know whether the government could have alleged that my reporting about the implausible official death toll from Hurricane Maria could have been prosecuted under these provisions. Was it reporting about an "abnormality"? Could the government have alleged that it was intended to cause "confusion, panic, or public hysteria"? The vagueness of these terms exacerbates the chilling effect these laws have on my reporting and commentary.

32.     The impact of these laws is particularly strong on independent investigative journalists like me, who have a history of calling the government to account. I am fearful that I may be charged under this law at any time for my investigative reporting. But the risk is not limited to outspoken government critics like me – the law has a chilling effect on the media as a whole.

33. The Puerto Rican public and our democracy suffer under this law, because people are deprived of the news coverage necessary to hold their leaders accountable. As we experienced after Hurricane Maria, independent journalism is more necessary than ever during an emergency. This law will discourage journalists from contradicting the government. If this law had been in effect during the hurricane, or during "chat-gate," those scandals may never have been revealed.

Pursuant to U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of May 2020.

By: S/E_____
Sandra Rodríguez Cotto