# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

SANDRA RODRÍGUEZ-COTTO;
RAFELLI GONZÁLEZ-COTTO,

*Plaintiffs*,

v.

WANDA VÁZQUEZ-GARCED, Governor
of Puerto Rico; DENNISE NOEMÍ
LONGO-QUIÑONES, Secretary of
Department of Justice of Puerto Rico;
PEDRO JANER, Secretary of Puerto Rico
Department of Public Safety; HENRY
ESCALERA, Puerto Rico Police
Commissioner, all in their official capacities,

*Defendants*.

Civil Action No. _____

Preliminary and Permanent Injunction

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ 2

INTRODUCTION ............................................................................................................... 5

FACTUAL BACKGROUND ............................................................................................... 9

ARGUMENT ..................................................................................................................... 17

   I.   Plaintiffs Are Likely to Succeed on the Merits. ............................................... 18

      A.   The Challenged Provisions Are Substantially Overbroad ............................. 18

      B.   The Challenged Provisions Are Unconstitutionally Content Based ............................. 22

      C.   The Challenged Provisions Are Unconstitutionally Vague ............................ 25

   II.   The Act's Infringement of Plaintiffs' First Amendment Rights Constitutes Irreparable Harm .......................................................................................................... 29

   III.   The Balance of Hardships and the Public Interest Support a Preliminary Injunction .......................................................................................................... 29

CONCLUSION ........................................................................................................... 30

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Ark. Writers' Project, Inc. v. Ragland*,
    481 U.S. 221 (1987) ......................................................................................... 19

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002) ......................................................................................... 16

*Ashton v. Kentucky*,
    384 U.S. 195 (1966) ......................................................................................... 24

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969) ................................................................................... 16, 17

*Brown v. Entm't Merchants Ass'n*,
    564 U.S. 786 (2011) ......................................................................................... 19

*Butler v. O'Brien*,
    663 F.3d 514 (1st Cir. 2011) ....................................................................... 21, 22

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) ......................................................................................... 18

*City of Chi. v. Morales*,
    527 U.S. 41 (1999) ........................................................................................... 21

*City of Houston v. Hill*,
    482 U.S. 451 (1987) ......................................................................................... 21

*CVS Pharmacy, Inc. v. Lavin*,
    951 F.3d 50 (1st Cir. 2020) .............................................................................. 13

*Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*,
    518 U.S. 727 (1996) ......................................................................................... 16

*Elrod v. Burns*,
    427 U.S. 347 (1976) ......................................................................................... 25

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ......................................................................................... 22

*F.C.C. v. League of Women Voters of Cal.*,
    468 U.S. 364 (1984)........................................................................... 17

*Firecross Ministries v. Municipality of Ponce*,
    204 F. Supp. 2d 244 (D.P.R. 2002).................................................. 25

*Garrison v. Louisiana*,
    379 U.S. 64 (1964)............................................................. 14, 15, 16

*Gentile v. State Bar of Nev.*,
    501 U.S. 1030 (1991)......................................................................... 23

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)................................................................... 21, 23

*Hill v. Colorado*,
    530 U.S. 703 (2000)............................................................................ 21

*Keyishian v. Bd. of Regents*,
    385 U.S. 589 (1967)............................................................................ 21

*Kolender v. Lawson*,
    461 U.S. 352 (1983)................................................................... 21, 22

*Magriz v. Union de Tronquistas de P.R., Local 901*,
    765 F. Supp. 2d 143 (D.P.R. 2011).................................................. 25

*Mangual v. Rotger-Sabat*,
    317 F.3d 45 (1st Cir. 2003).................................................. 2, 10, 15, 24

*McCullen v. Coakley*,
    573 U.S. 464 (2014)................................................................... 17, 20

*Miller v. City of Cincinnati*,
    622 F.3d 524 (6th Cir. 2010) ........................................................... 25

*Mills v. Alabama*,
    384 U.S. 214 (1966)............................................................................ 14

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)................................................................... 14, 15

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971)............................................................................ 19

*NAACP v. Button*,
    371 U.S. 415 (1963)................................................................... 14, 22

*Police Dep't of City of Chi. v. Mosley*,
    408 U.S. 92 (1972) .................................................................................. 17

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) ...................................................................... 17, 18

*Rosenblatt v. Baer*,
    383 U.S. 75 (1966) .................................................................................. 18

*Schenck v. United States*,
    249 U.S. 47 (1919) .................................................................................. 16

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
    699 F.3d 1 (1st Cir. 2012) ................................................................ 13, 24

*Smith v. Goguen*,
    415 U.S. 566 (1974) ................................................................................ 21

*Stanley v. Georgia*,
    394 U.S. 557 (1969) ................................................................................ 16

*Stromberg v. California*,
    283 U.S. 359 (1931) ................................................................................ 14

*United States v. Alvarez*,
    567 U.S. 709 (2012) ............................................................ 2, 18, 20, 22

*United States v. Playboy Entm't Grp.*,
    529 U.S. 803 (2000) ......................................................................... 19, 20

*United States v. Williams*,
    553 U.S. 285 (2008) ......................................................................... 13, 14

*URI Student Senate v. Town of Narragansett*,
    631 F.3d 1 (1st Cir. 2011) ...................................................................... 21

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ................................................................................ 21

## <u>Statutes</u>

25 L.P.R.A. § 3501 ......................................................................................... 5

25 L.P.R.A. § 3654 ................................................................................ passim

33 L.P.R.A. § 4694(e) ................................................................................................ 8

Law 20-2017 ............................................................................................................... 5

Law 35-2020 ............................................................................................ 8, 9, 19, 20

## Other Authorities

Administrative Bullet No. 2020-029 (Certified Translation), Government of Puerto Rico,
   Mar. 30, 2020 ......................................................................................................... 6

Alex Cancel, *Ante FBI el mensaje falso que causó alarma por WhatsApp*, El Nuevo Día,
   Mar. 23, 2020 ......................................................................................................... 6

Amanda Perez Pintado, *Shutdown: The Coronavirus: Puerto Ricans Crowd Supermarkets as
   Government Ramps Up Restrictions*, Pavement Pieces (Apr. 6, 2020) ..................... 7

Associated Press, *Puerto Rico Orders Curfew, Business Closures for Coronavirus*,
   Mar. 15, 2020 ......................................................................................................... 6

Donald McNeil Jr., *Coronavirus Has Become a Pandemic, W.H.O. Says*, N.Y. Times,
   Mar. 11, 2020 ......................................................................................................... 6

Frances Robles, *Puerto Rican Government Acknowledges Hurricane Death Toll of 1,427*,
   N.Y. Times, Aug. 9, 2018 ...................................................................................... 11

Noticel, *Señalan a pastor como autor de audio falso por Whatsapp*, Mar. 23, 2020 ................... 7

O'Neill & Borges LLC, *Puerto Rico Executive Order Mandates Total Weekend Lockdown*
   (Apr. 2020) ............................................................................................................. 7

Telemundo PR, *Determinan no causa contra pastor por mensaje enviado por WhatsApp*,
   May 7, 2020 ............................................................................................................ 7

## INTRODUCTION

Plaintiffs Sandra D. Rodríguez-Cotto and Rafelli González-Cotto move for a preliminary

injunction against two provisions of the Law of the Puerto Rico Department of Public Safety,

both of which make it a crime to share false information about emergency conditions in Puerto

Rico.[1] The first challenged provision, 25 L.P.R.A. § 3654(a), makes it a crime to raise a false alarm about an impending emergency or catastrophe in Puerto Rico or to "spread[] rumors or rais[e] false alarms regarding nonexisting abnormalities" during an emergency. The second challenged provision, 25 L.P.R.A. § 3654(f), makes it a crime to transmit, or allow another person to transmit, "false information" about "any proclamation or executive order decreeing a state of emergency or disaster or curfew" with the intent to cause "confusion, panic, or collective public hysteria."

The Challenged Provisions violate the constitutional rights to free speech, a free press, and due process. First, the Challenged Provisions criminalize a substantial amount of core speech on matters of immense public concern, in violation of the First Amendment. Although they ostensibly apply only to *false* information about emergency conditions in Puerto Rico, they do not require the government to demonstrate that the defendant published the information with

---

[1] The Challenged Provisions read as follows:

Será sancionada con pena de reclusión que no excederá de seis (6) meses o multa que no excederá de cinco mil (5,000) dólares o ambas penas a discreción del tribunal, toda persona que realizare cualquiera de los siguientes actos:

(a) Dé una falsa alarma en relación con la inminente ocurrencia de una catástrofe en Puerto Rico o, si existiendo ya un estado de emergencia o desastre, disemine rumores o dé falsas alarmas sobre anormalidades no existentes.
. . . .

(f) Transmita o permita transmitir por cualquier medio, a través de cualquier red social o medio de comunicación masivo, información falsa con la intención de crear confusión, pánico o histeria pública colectiva, con respecto a cualquier proclama u orden ejecutiva decretando un estado de emergencia o desastre o toque de queda. En el caso de que la diseminación de información falsa resulte en daños al erario público, o a terceros, o la propiedad pública o privada, que excedan los diez mil (10,000) dólares, o cuando la conducta resulte en lesiones o daños físicos, se impondrá la pena correspondiente a la de un delito grave en cuarto grado.

25 L.P.R.A. § 3654(a), (f), http://www.agencias.pr.gov/ogp/Bvirtual/LeyesOrganicas/pages/20-2017.aspx. Pursuant to Local Rule 5(g), Plaintiffs will file a certified translation of these provisions and relevant cited news articles. All English translations hereinafter are uncertified.

actual malice—i.e., that the defendant knew the speech to be false or acted with reckless

disregard as to falsity. Without this essential safeguard, the Challenged Provisions may be used

to prosecute reporters and other members of the public for inadvertent inaccuracies or even for

true speech that casts the government and its officials in a negative light, as Puerto Rico's former

criminal defamation law was used to prosecute reporters who exposed police misconduct.

*Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003).

Second, even if the Challenged Provisions were limited to deliberately false speech about

emergency conditions in Puerto Rico, they would still violate the First Amendment because they

impose a content-based restriction on speech about matters of public concern. As the Supreme

Court recognized in *United States v. Alvarez*, 567 U.S. 709 (2012), even deliberately false speech

is protected by the First Amendment under most circumstances. At the very least, content-based

restrictions on false but otherwise protected speech about matters of public concern must endure

the most stringent judicial scrutiny. That is because allowing the government to serve as the

arbiter of truth on such vitally important topics, even with the protections of an actual malice

requirement, presents an unacceptable risk of suppressing truthful speech. Here, the Challenged

Provisions cannot possibly satisfy strict (or even intermediate) scrutiny, because they are not

appropriately tailored to any overriding government interest. There is no evidence that so-called

fake news about emergency conditions in Puerto Rico creates significant risks to public health or

public order. But even if there were, government transparency would be the appropriate remedy,

not government censorship.

Finally, the Challenged Provisions violate the Fourteenth Amendment's Due Process

Clause because they are too vague for criminal restrictions on speech. It is impossible to

determine what constitutes a "non-existing abnormality" under 25 L.P.R.A. § 3654(a) or an

intent to cause "confusion" under 25 L.P.R.A. § 3654(f). These terms are so capacious they could conceivably apply to any speech related to emergency conditions in Puerto Rico during the COVID-19 public health crisis, which effectively means almost all newsworthy speech. The vagueness inherent in these terms not only fails to provide Plaintiffs and others with adequate notice about what types of false speech are prohibited, it also gives law enforcement officials virtually untethered discretion in deciding whom to prosecute. The obvious danger, under such circumstances, is that the Challenged Provisions will be used to selectively prosecute those who criticize the government and its officials.

The threat of prosecution under the Challenged Provisions is already imposing a chilling effect on Plaintiffs and other members of the press. Plaintiffs and their sources reasonably fear that inadvertent inaccuracies or critical reporting on the government will result in their prosecution, and this fear has made it more difficult for Plaintiffs to perform their journalistic duty to inform the public about the COVID-19 public health emergency in Puerto Rico. The present threat of prosecution, and its attendant chilling effect, is more than sufficient to establish irreparable harm for purposes of a preliminary injunction. Furthermore, the balance of hardships and the public interest support a preliminary injunction vindicating constitutional rights. Robust public discussion, free from government interference, is essential to democratic governance, especially during times of emergency when the government claims extraordinary powers. Because the Challenged Provisions violate the fundamental freedoms protected by the First Amendment, they must be immediately enjoined.

## FACTUAL BACKGROUND

### Plaintiffs

Plaintiff Sandra D. Rodríguez-Cotto is an independent journalist with over 30 years of experience in print, television, magazines, radio and digital media in Puerto Rico, the United States and several Latin American countries. See Exhibit 1, Declaration of Sandra D. Rodríguez-Cotto ("Rodríguez-Cotto Decl.") ¶ 3. Ms. Rodríguez- Cotto currently hosts the syndicated radio program "En Blanco y Negro con Sandra" that airs daily, Monday to Friday, at 1 PM on at least 11 broadcast and online radio stations throughout Puerto Rico. *Id.* ¶ 4. Since 2010, she has published a blog by the same name, "En Blanco y Negro con Sandra," where she features her own news stories, in-depth reporting, and analysis of the media and politics. *Id.* In 2019, she received the Bolívar Pagán National Literature and Journalism Award from the Institute of Puerto Rican Literature. *Id.* ¶ 10.

Ms. Rodríguez-Cotto's coverage of the use misogynistic language and descriptions of violence against women in a Telegram chat between Governor Ricardo Rosselló and his aides sparked island-wide protests that led to Governor Rosselló's resignation. *Id.* ¶ 21–22. Her reporting has been picked up by media outlets across the world, including the *New York Times*, *Guardian*, *VICE*, *MTV*, *Christian Science Monitor*, and many others. *Id.* ¶ 21.

Plaintiff Rafelli González-Cotto an independent journalist with over 10 years of experience in print, magazines, radio, TV and digital media in Puerto Rico. Exhibit 2, Declaration of Rafelli González-Cotto ("González-Cotto Decl.") ¶ 3. He is also a lawyer and notary public. *Id.* He has worked with several newspapers on the island, including *El Nuevo Día*, *Caribbean Business* and *CB en Español*, where he was the Digital Editor. *Id.* ¶ 4. Subsequently, he was appointed as the Digital Executive Editor at Latin Media House, a publishing house,

where he directed the electronic platforms of six publications, two newspapers, and four,

magazines for approximately three years. *Id.*

In 2017, while serving as the Digital Editor for *Caribbean Business* and *CB en Español*,

Mr. González Cotto participated in the publication of several digital stories about the Whitefish

Energy scandal. *Id.* ¶ 5. Those stories revealed that the Puerto Rico Electric Power Authority

("PREPA") awarded a $300 million contract to rebuild Puerto Rico's electric grid to a small

private company with limited experience and only two registered employees, instead of

requesting cooperation through the mutual assistance program of the American Public Power

Association. *Id.* Notably, the contract also prohibited the government from auditing the "cost and

profit elements" of the contractor's labor rates. *Id.* The story generated significant controversy in

Puerto Rico and the United States. *Id.* PREPA subsequently canceled the contract at the request

of then-Governor Ricardo Rosselló. *Id.*

## The Challenged Provisions

On April 10, 2017, Puerto Rico enacted Law 20-2017, the Law of the Puerto Rico

Department of Public Safety, 25 L.P.R.A. § 3501 et seq. Section 6.14 of the Act, codified at 25

L.P.R.A. § 3654, makes it a crime to share false information relating to emergency conditions in

Puerto Rico. It provides in relevant part as follows:

> Any person who commits any of the following acts shall be punished by a term of
> imprisonment not to exceed six (6) months or by a fine not to exceed five thousand
> (5,000) dollars or both penalties at the discretion of the court:
>
> (a) Raising a false alarm with respect to the imminent occurrence of a catastrophe in
>     Puerto Rico, or spreading rumors or raising a false alarm regarding nonexisting
>     abnormalities.[2]

---

[2] *See supra* note 1 for untranslated text.

This provision was recently invoked to prosecute a pastor for spreading allegedly false information about government emergency orders on the messaging platform WhatsApp.[3]

COVID-19 is a novel infectious disease caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). On March 11, 2020, the World Health Organization declared the spread of COVID-19 a global pandemic.[4] On March 15, 2020, Governor Vázquez issued the first of several executive orders establishing emergency measures to control the spread of the virus that causes COVID-19 in Puerto Rico, Administrative Bulletin No. OE-2020-023. The order imposed an island-wide curfew and closed all businesses not involved in food sales, medicine, or banking.[5] The order imposed an island-wide curfew and closed all businesses not involved in food sales, medicine, or banking. On March 30, 2020, through Administrative Bulletin No. OE-2020-029, Governor Vázquez declared that the government would extend the curfew and tightened restrictions on non-essential activity, including by requiring non-essential workers to return home by 7 p.m. and limiting motorists' use of the public roads.[6] Throughout the COVID-19 public health crisis, the government has been disquietingly opaque about its actions and the current state of the public health emergency. For example, between April 17 and May 17, Governor Vázquez has barely appeared at two official press conferences to speak about the virus.

---

[3] Alex Cancel, *Ante FBI el mensaje falso que causó alarma por WhatsApp*, El Nuevo Día, Mar. 23, 2020, https://www.elnuevodia.com/noticias/seguridad/nota/antefbielmensajefalsoquecausoalarmaporwhatsapp-2555078/. Pursuant to Local Rule 5(g), Plaintiffs will file a certified translation of this article.

[4] *See* Donald McNeil Jr., *Coronavirus Has Become a Pandemic, W.H.O. Says*, N.Y. Times, Mar. 11, 2020, https://www.nytimes.com/2020/03/11/health/coronavirus-pandemic-who.html.

[5] *See* Associated Press, *Puerto Rico Orders Curfew, Business Closures for Coronavirus*, Mar. 15, 2020, https://apnews.com/0709f80ce89f9c004aa3c9eddf3166f4.

[6] Administrative Bullet No. 2020-029 (Certified Translation), Government of Puerto Rico, Mar. 30, 2020, *available at* https://www.littler.com/files/oe-2020-029.pdf.

González Cotto Decl. ¶ 21. In her last appearance on May 12, she spent five minutes answering questions from the press. *Id.*

Meanwhile, the government accused Pastor José Luis Rivera Santiago of violating 25 L.P.R.A. § 3654(a) by disseminating false information on the messaging platform WhatsApp about a rumored executive emergency order to close all businesses. The government alleged that Pastor Rivera Santiago's speech resulted in a rush on the supermarkets.[7] In fact, however, Governor Vázquez did eventually announce an executive order closing almost all businesses in Puerto Rico over Easter weekend, which itself caused a run on the grocery stores.[8] On May 7, police confirmed that charges against the pastor had been dismissed by the Court of San Juan for lack of probable cause.[9] Pastor Rivera Santiago's prosecution alerted Plaintiffs, and other members of the press, about the dangers of being prosecuted under the fake news laws. Rodríguez Cotto Decl. ¶¶ 26–27; González Cotto Decl. ¶¶ 11–12.

While Pastor Rivera Santiago's prosecution was pending, the government swiftly enacted Law 35-2020, which *inter alia* amended 25 L.P.R.A. § 3654 to add a second fake news offense. The amendment makes it a crime to "[t]ransmit or allow [another person] to transmit, by any

---

[7] *See* NotiCel, *Señalan a pastor como autor de audio falso por Whatsapp*, Mar. 23, 2020, https://www.noticel.com/ahora/20200323/senalan-a-pastor-como-responsable-de-audio-falso-por-whatsapp/. Pursuant to Local Rule 5(g), Plaintiffs will file a certified translation of this article.

[8] Amanda Perez Pintado, *Shutdown: The Coronavirus: Puerto Ricans Crowd Supermarkets as Government Ramps Up Restrictions*, Pavement Pieces (Apr. 6, 2020), https://pavementpieces.com/puerto-ricans-crowd-supermarkets-as-government-ramps-us-restrictions/. *See also* O'Neill & Borges LLC, *Puerto Rico Executive Order Mandates Total Weekend Lockdown* (Apr. 2020), https://www.oneillborges.com/our_client_alert/puerto-rico-executive-order-mandates-total-weekend-lockdown/.

[9] Telemundo PR, *Determinan no causa contra pastor por mensaje enviado por WhatsApp*, May 7, 2020, https://www.telemundopr.com/noticias/puerto-rico/determinan-no-causa-contra-pastor-por-mensaje-enviado-por-whatsapp/2079507/. Pursuant to Local Rule 5(g), Plaintiffs will file a certified translation of this article.

means, through any social network or mass media, false information with the intention of creating confusion, panic or collective public hysteria, regarding any proclamation or executive order decreeing a state of emergency or disaster or curfew." It further states that the offense may be charged as a felony in the fourth degree "[i]n the event that the dissemination of false information results in damages to the public treasury, or to third parties, or public or private property, that exceed ten thousand (10,000) dollars, or when the conduct results in physical injury or damage."[10] Fourth degree felonies in Puerto Rico are punishable by at least six months, and up to three years, in prison. 33 L.P.R.A. § 4694(e).

Law 35-2020's Statement of Motives provides, in relevant part: "[I]t is highly reproachable that malicious people use social media or mass media to disseminate false information with the intention of creating confusion, panic or collective public hysteria" during a declared state of emergency or disaster, because "[s]uch conduct threatens the security of the people and the social order, endangering the health and lives of citizens."[11] The law took effect immediately upon its enactment.[12]

---

[10] Ley Núm. 35-2020 [Law 35-2020], http://www.agencias.pr.gov/ogp/Bvirtual/leyesreferencia/PDF/2020/0035-2020.pdf. Pursuant to Local Rule 5(g), Plaintiffs will file a certified translation of Law 35-2020. *See supra* note 1 for untranslated text.

[11] *See supra* n.9. The untranslated text of the relevant paragraph reads as follows: Por otro lado, resulta altamente reprochable que personas mal intencionadas utilicen las redes sociales o medios de comunicación masiva, para diseminar información falsa con la intención de crear confusión, pánico o histeria pública colectiva en nuestro pueblo, mientras se encuentra vigente un estado de emergencia o desastre o toque de queda promulgado por el gobernador de Puerto Rico mediante una Orden Ejecutiva. Dicha conducta atenta contra la seguridad del pueblo y el orden social, poniendo en peligro la salud y la vida de los ciudadanos.

[12] *See supra* n.9.

13

## The Threat of Prosecution and the Chilling Effect

Pastor Rivera Santiago's prosecution and the recent enactment of Law 35-2020 have made clear that the government will not tolerate what it considers to be false information about the COVID-19 public health emergency and the government's emergency orders. Of course, Plaintiffs consistently factcheck their work, in accordance with standard journalistic practices. However, they recognize that even the most thoroughly vetted stories may contain inadvertent inaccuracies, especially during times of emergency when facts are developing quickly on the ground, and that the government may dispute factually accurate reporting. Rodríguez Cotto Decl. ¶ 27; González Cotto Decl. ¶ 14. Plaintiffs, as well as other journalists and members of the public, are now on notice that they may be criminally prosecuted under 25 L.P.R.A. §§ 3654(a) and (f) for inadvertent inaccuracies in their speech about emergency conditions in Puerto Rico, or for sharing news or commentary about the emergency that contradicts the government's official narrative.

The threat of prosecution under the Challenged Provisions has palpably chilled Ms. Rodríguez Cotto in her reporting about the COVID-19 public health emergency. Rodríguez Cotto Decl. ¶¶ 26–32. As Ms. Rodríguez Cotto states in her declaration: "It is already risky for journalists to challenge the government and now we risk a criminal conviction if anything we publish is eventually disproved, even if the error was unintentional. These laws allow the government broad discretion to harass and punish journalists. Now, journalists could face prison time if we publish material that has not been verified by the government." Rodríguez Cotto Decl. ¶ 30. Ms. Rodríguez Cotto's sources have refrained from sharing important information, because they are afraid that they, too, could be prosecuted under the Challenged Provisions. *Id.* ¶ 29.

Ms. Rodríguez Cotto's fear of prosecution under the Challenged Provisions is informed by her years of experience reporting on the government. In 1999, while Ms. Rodríguez Cotto was president of the Overseas Press Club, the Club went to court to defend Obed Betancourt and the newspaper *El Vocero* against a criminal defamation prosecution for articles Mr. Betancourt published describing police corruption. *Id.* ¶ 11. At the probable cause hearing, the government did not attempt to demonstrate that the defendants knew the articles to be false, or even that the articles contained any false information, and the court dismissed the prosecution for lack of probable cause. *Id.* The Club then sought to intervene in a federal lawsuit challenging Puerto Rico's criminal defamation law. *Id.* ¶ 12.  Although the Club's motion to intervene was denied, the law was ultimately struck down by the U.S. Court of Appeals for the First Circuit, on the ground that it violated the First Amendment. *Id.*; *see Mangual*, 317 F.3d 45. Ms. Rodríguez Cotto's experience with these cases demonstrated to her the danger of allowing the government to prosecute speech that it deems to be false. Rodríguez Cotto Decl. ¶ 13.

Ms. Rodríguez Cotto is also keenly aware that the government may distort information about public emergencies in order to suit its political interests. In 2017, Ms. Rodríguez Cotto reported on the inadequacy of the responses by the U.S. government and the Puerto Rico government to the widespread devastation left by Hurricane Maria. *Id.* ¶ 15. Local officials, including then-Governor Ricardo Rosselló, repeatedly failed to provide credible information about the scale of the impact of the hurricane, claiming for months that the death toll was a few dozen, when in reality it was more than a thousand. *Id.* During an on-air interview, Ms. Rodríguez Cotto challenged then-Chief of Staff Ramón Rosario about the implausibility of the official death toll; he responded by accusing her of exaggerating. *Id.* ¶ 17. Immediately following that interview, and for several months afterwards, Ms. Rodríguez Cotto received thousands of

messages via social media, many of them racist and misogynistic. *Id.* Shortly after the interview, her house was broken into under suspicious circumstances, though nothing was stolen. *Id.* ¶ 18. She filed a complaint with the police, who told her that the break-in was likely intended to "send a message." *Id.* Ultimately, the Puerto Rican government acknowledged that the official death toll of 64 was inaccurate, and that the revised death toll was 1,427.[13]

Mr. González Cotto recently identified a similar problem with the government's case fatality measurement for the COVID-19 public health emergency. In a news article published in *NotiCel*, Mr. González Cotto revealed that the case fatality rate published by the Health Department was not calculated in accordance with generally accepted practices, resulting in a significant underestimation of the fatality rate. González Cotto Decl. ¶ 8. Half an hour after the article was published, the Health Department removed the information from its website. *Id.*

Mr. González Cotto has published numerous other articles about the COVID-19 public health emergency and the government's response. For instance, he published an article revealing that certain companies with close ties to Governor Vázquez's New Progressive Party received multimillion-dollar government contracts for rapid test kits to identify COVID-19 antibodies, even though the companies had little experience managing medical supplies. *Id.* ¶ 7. Another one of Mr. González Cotto's articles reported that seven powerful businessmen were actively lobbying Governor Vázquez and two agency heads to lift many of the emergency restrictions and reopen businesses, despite the absence of reliable data about how reopening would affect the public health crisis. *Id.* ¶ 9. That article was based on information and documentary evidence provided to Mr. González Cotto by an anonymous source. *Id.*

---

[13] *See* Frances Robles, *Puerto Rican Government Acknowledges Hurricane Death Toll of 1,427*, N.Y. Times, Aug. 9, 2018, https://www.nytimes.com/2018/08/09/us/puerto-rico-death-toll-maria.html.

Like Ms. Rodríguez Cotto, Mr. González Cotto reasonably fears that his reporting, which often challenges the government's official narrative about the COVID-19 public health emergency or reveals new information that may cast the government's actions in a negative light, could expose him to prosecution under the Challenged Provisions. *Id.* ¶¶ 12–19. And the threat of prosecution under 25 L.P.R.A. §§ 3654(a) and (f) is currently chilling Mr. González Cotto's own reporting, as well as his access to sources. *Id.* ¶¶ 15, 16.

Finally, the chill imposed by 25 L.P.R.A. §§ 3654(a) and (f) on Plaintiffs is exacerbated by the vagueness of the provisions themselves. Plaintiffs are unable to determine what constitutes a "non-existing abnormality" under 25 L.P.R.A. § 3654(a) or an intent to cause "confusion, panic, or public hysteria" under 25 L.P.R.A. § 3654(f), or how these provisions might have applied to their own reporting if the reporting was deemed to include "false information." Rodríguez Cotto Decl. ¶ 31; González Cotto Decl. ¶¶ 18–19. For instance, Ms. Rodríguez Cotto cannot ascertain whether her reporting about the death toll from Hurricane Maria would have been considered a "non-existing abnormality" before the official death toll was revised. Rodríguez Cotto Decl. ¶ 31.

## ARGUMENT

When assessing a motion for preliminary injunction, this Court must consider four factors: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm; (3) the balance of the equities; and (4) the public interest. *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012). As discussed below,

17

each of the four factors supports Plaintiffs' motion for a preliminary injunction against the Challenged Provisions.

I.       **Plaintiffs Are Likely to Succeed on the Merits.**

Plaintiffs are likely to succeed in demonstrating that the Challenged Provisions violate their rights under the First and Fourteenth Amendments to the U.S. Constitution. These provisions are unconstitutional for at least three reasons: First, they are substantially overbroad, criminalizing and chilling a significant amount of protected speech on matters of immense public concern. Second, they impose content-based restrictions on speech about emergency conditions in Puerto Rico, and they cannot satisfy strict or event intermediate scrutiny. Finally, they are unconstitutionally vague, especially for criminal laws regulating speech. Plaintiffs' success on any one of these grounds would justify a preliminary injunction.

A.  **The Challenged Provisions Are Substantially Overbroad.**

First, the Challenged Provisions are facially deficient because they do not require the government to demonstrate that the defendant published with actual malice. "According to [the Supreme Court's] First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). To justify facial relief under the overbreadth doctrine, a plaintiff must demonstrate that the challenged statute is overbroad both in an absolute sense and judged in relation to the statute's plainly legitimate sweep. *Id.*

The subject matter regulated by the Challenged Provisions—speech about emergency conditions in Puerto Rico, including government curfew and other emergency orders—lies at the very heart of the First Amendment. Because "speech concerning public affairs . . . is the essence of self-government," *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964), "there is practically

universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs," *Mills v. Alabama*, 384 U.S. 214, 218 (1966). "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg v. California*, 283 U.S. 359, 369 (1931).

Although the Challenged Provisions purport to criminalize only false information, that "does not mean that only false speech will be deterred." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). People who wish to discuss information about the COVID-19 public health emergency and the government's response may be deterred, "even though [such information] is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." *Id.* "[E]rroneous statement is inevitable in free debate," and "it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *Id.* at 271 (omission in original) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

To ensure that "debate on public issues [remains] uninhibited, robust, and wide-open," *id.* at 270, the Supreme Court held in *Sullivan* that even false and defamatory speech about government officials may not constitutionally be punished unless the government establishes "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not," *id.* at 279–80 (citation omitted). In *Garrison*, the Supreme Court held that the same requirement "appl[ies] with no less force" to criminal defamation laws. 379 U.S. at 215–16. Applying *Garrison*, the First Circuit struck down Puerto Rico's criminal defamation law on the ground that it did not include an actual malice

19

requirement. *Mangual*, 317 F.3d at 66 ("Section 4101, on its face, is constitutionally deficient, in that it does not require that the [*Sullivan*] and *Garrison* standard of actual malice be proven in order for a statement disparaging a public official or figure to be successfully prosecuted.").

The Challenged Provisions suffer from the same fundamental defect as the criminal defamation law struck down in *Mangual*. They do not require the government to demonstrate that the defendant either knew the information to be false or acted with reckless disregard as to falsity. In other words, the Challenged Provisions authorize the government to prosecute people for inadvertent inaccuracies or speech that the government deems to be false. The absence of an actual malice requirement would be fatal in any criminal law restricting speech on matters of public concern, but it is especially pernicious in a law regulating speech about emergencies. By their very nature, emergencies are time-sensitive, factually complex, and politically contentious. Laws that make it a crime to share false information in an emergency, without requiring the government to demonstrate that the speaker acted with actual malice, are guaranteed to chill reporting and commentary that does not toe the government's official line—which can have disastrous consequences if the government's official line turns out to be wrong, as it was during the controversy over the death toll caused by Hurricane Maria. *See supra* n.13.

Although 25 L.P.R.A. § 3654(f) requires the government to demonstrate that the defendant intended to cause "confusion, panic, or public hysteria," this nebulous intent standard is not a legitimate substitute for an actual malice requirement. First, any speech criticizing emergency measures the government deems necessary or important will likely be viewed by the government as motivated by the illicit desire to cause "confusion, panic, or public hysteria." *See Garrison*, 379 U.S. at 74 (noting that, in many criminal defamation cases, it will be "almost impossible to show freedom from ill-will or selfish political motives" (citation and internal

quotation marks omitted)). Putting that aside, "utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth," regardless of whether they are spoken with benign or illicit intent. *Garrison*, 379 U.S. at 73. Confusion, panic, and even public hysteria may be natural responses to news about a public emergency or the government's response to that emergency. But the public has a right to know what is going on, and journalists have a professional duty to report on matters of public concern, without regard to their personal predictions about how people might react.

Nor can the Challenged Provisions be justified on the ground that false speech about emergency conditions in Puerto Rico creates a "clear and present danger" to public safety. *See Schenck v. United States*, 249 U.S. 47, 52 (1919). "[T]he clear and present danger of *Schenck v. United States*, 249 U.S. 47 (1919), has evolved into the modern incitement rule of *Brandenburg v. Ohio*, 395 U.S. 444 (1969)." *Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 778 (1996) (parallel citations omitted). As a result, it is now well established that "the mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 236 (2002) (citing *Stanley v. Georgia*, 394 U.S. 557, 566 (1969)).

Speech may be suppressed on the ground that it incites unlawful conduct only where the speech "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447. But the Challenged Provisions are plainly not limited to incitement. Neither provision requires the government to demonstrate that the defendant's speech was directed to producing imminent lawless action or that the speech was likely to produce such action. "A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps

within its condemnation speech which our Constitution has immunized from governmental control." *Id.* at 448.

### B.  The Challenged Provisions Are Unconstitutionally Content Based.

Second, the Challenged Provisions impose content-based restrictions on speech about emergency conditions in Puerto Rico, including the government's emergency orders. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (citations omitted). In other words, a law is facially content based "if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (quoting *F.C.C. v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)). Content-based laws are presumptively unconstitutional and are subject to strict judicial scrutiny. *Reed*, 135 S.Ct. at 2226–27. This "is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

The Challenged Provisions are facially content-based restrictions on speech about public emergencies in Puerto Rico. 25 L.P.R.A. § 3654(a) prohibits raising a false alarm about an impending emergency in Puerto Rico or, if an emergency is already occurring, "spread[ing] rumors or giv[ing] false alarms about non-existing abnormalities." 25 L.P.R.A. § 3654(f) makes it a crime to share false information about "any proclamation or executive order decreeing a state

of emergency or disaster or curfew." Both provisions require enforcement authorities to examine the content of the offending message to determine whether it constitutes a crime.

As discussed in Section I.A, the Challenged Provisions are in no way limited to deliberately false speech. But even if they were, the Challenged Provisions would still be facially unconstitutional. The Supreme Court plurality in *Alvarez* held that content-based restrictions on deliberately false speech trigger strict scrutiny, because the government does not have the "authority to compile a list of subjects about which false statements are punishable." *Alvarez*, 567 U.S. at 724 (2012) (plurality op.). Although the concurrence and dissent disagreed with the plurality about whether strict scrutiny applies to all content-based restrictions on deliberately false but otherwise speech, the Justices unanimously agreed that content-based restrictions on false speech about "matters of public concern" ordinarily trigger strict scrutiny, because allowing "the state to be the arbiter of truth" on such matters "would present a grave and unacceptable danger of suppressing truthful speech." *Id.* at 751–52 (Alito, J., dissenting); *accord id.* at 731–32 (Breyer, J., concurring). Thus, for example, "the Constitution does not tolerate in any form" the "spectre of prosecutions for libel on government," regardless of the defendant's knowledge or intent. *Rosenblatt v. Baer*, 383 U.S. 75, 81 (1966).

Strict scrutiny requires the government to demonstrate that the restriction is both "necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987).  In order to demonstrate that a content-based restriction on speech is "actually necessary" to achieve a compelling government interest, the government "must specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011) (citations and internal quotation marks omitted).

Furthermore, the government's conclusions must be supported by actual evidence, not "anecdote and supposition." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 822 (2000).

The Statement of Motives for Law 35-2020 indicates that 25 L.P.R.A. § 3654(f) was enacted because false speech about government emergency orders "threatens the security of the people and the social order, endangering the health and life of citizens." *See supra* nn.10, 11. This bare conclusion is insufficient to justify a restriction on speech. "The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." *N.Y. Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring). The Framers of the Constitution, "fully aware of both the need to defend a new nation and the abuses of the English and Colonial Governments, sought to give this new society strength and security by providing that freedom of speech, press, religion, and assembly should not be abridged." *Id.* Furthermore, there are no legislative findings to support the government's supposition that false speech about emergency conditions in Puerto Rico poses a significant threat to public health and security. Nor is there any evidence that the Challenged Provisions will meaningfully contribute to public wellbeing, or even that they will prevent public confusion. *See Alvarez*, 567 U.S. at 728 ("[S]uppression of speech by the government can make exposure of falsity more difficult, not less so").

The Challenged Provisions are also far from the least restrictive means for achieving the government's stated interests. To satisfy the least restrictive means test, the government must demonstrate that any "plausible, less restrictive alternative would be ineffective" in achieving its compelling goals. *Playboy Entm't Grp.*, 529 U.S. at 824. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* at 815. In this case, there is an obvious less-restrictive alternative at the government's disposal: counterspeech.

24

*Alvarez*, 567 U.S. at 727 ("The remedy for speech that is false is speech that is true. This is the ordinary course in a free society."). For instance, the government could prevent false speech about emergency conditions in Puerto Rico from causing public consternation by holding regular press briefings, releasing pertinent records, and explaining its planned course of action to the public. *See id.* at 729 (suggesting that, instead of making it a crime to falsely claim the Medal of Honor, the government could establish a public database of Medal of Honor recipients). Government transparency is likely to be much more effective at maintaining public order, and building public trust, than government censorship. Law 35-2020's legislative findings do nothing to rebut the strong presumption that increased government transparency should be sufficient to prevent public disorder caused by public confusion. *Id.* at 726.[14]

### C.  The Challenged Provisions Are Unconstitutionally Vague.

The Challenged Provisions are also unconstitutionally vague, both on their face and as applied to Plaintiffs, in violation of the Fourteenth Amendment's Due Process Clause. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *City of Chi. v. Morales*, 527 U.S. 41, 56–57 (1999)); *accord,*

---

[14] Alternatively, the Challenged Provisions cannot survive even intermediate scrutiny for all of the reasons identified above. *See McCullen*, 573 U.S. at 477 (holding that content-neutral laws, which are subject to intermediate scrutiny, must be narrowly tailored to a substantial government interest); *see also Alvarez*, 567 U.S. at 737–739 (Breyer, J., concurring) (concluding that the Stolen Valor Act failed intermediate scrutiny because it was not narrowly tailored to the government's substantial interest in protecting "those who have sacrificed their health and life for their country," and noting that "accurate information will normally counteract the lie").

*e.g.*, *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 13–14 (1st Cir. 2011); *Butler v. O'Brien*, 663 F.3d 514, 518 (1st Cir. 2011). Of these two requirements, "the more important aspect of vagueness doctrine 'is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). Thus, even a law that is not formally vague may violate due process if it is too easily susceptible to abuse by government officials.

Two thumbs are placed on the scale when assessing a vagueness challenge to a criminal regulation of speech, such as the Challenged Provisions. First, although the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties," *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982), it has made clear that "[c]riminal statutes must be scrutinized [for vagueness] with particular care," *City of Houston v. Hill*, 482 U.S. 451, 459 (1987). Second, laws regulating speech are subject to a "more stringent vagueness test" than laws regulating conduct. *Hoffman Estates*, 455 U.S. at 499. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967) (internal quotation marks omitted) (quoting *Button*, 371 U.S. at 433). The heightened vagueness standard applied to laws regulating speech is necessary, both to "ensure that ambiguity does not chill protected speech," *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012), and because "there are enhanced concerns about arbitrary enforcement under the void for vagueness doctrine where there is the 'potential for arbitrarily suppressing First Amendment liberties[.]'" *Butler*, 663 F.3d at 520 (quoting *Kolender*, 461 U.S. at 358).

These principles require the application of the most stringent vagueness scrutiny to the Challenged Provisions. The laws cannot satisfy this demanding standard. First, L.P.R.A.

§3654(a) is unconstitutionally vague because it is entirely unclear what the law means when it prohibits sharing false information about "non-existing abnormalities" during a state of emergency or disaster. By definition, states of emergency are almost entirely abnormal. A prohibition against sharing false information about "non-existing abnormalities" during a state of emergency therefore potentially applies to false speech on just about any matter of public concern, from the health of government officials to changes in election procedures to economic forecasts, for as long as the state of emergency lasts.

This all-encompassing standard not only fails to provide adequate notice about what speech is prohibited—for instance, it is unclear whether it applies to disputes about the death toll or the fatality rate, *see* Rodríguez Cotto Decl. ¶ 27, 31; González Cotto Decl. ¶ 17—it also makes the statute highly susceptible to discriminatory enforcement. "[T]he pervasiveness of false statements, made for better or for worse motives, made thoughtlessly or deliberately, made with or without accompanying harm, provides a weapon to a government broadly empowered to prosecute falsity without more. And those who are unpopular may fear that the government will use that weapon selectively[.]" *Alvarez*, 567 U.S. at 734 (Breyer, J., concurring).

Second, L.P.R.A. § 3654(f) is unconstitutionally vague because the statute's intent requirement is too nebulous to bring it within constitutional bounds. It is unclear what the law means by "confusion," and the terms "panic" and "public hysteria" are not much clearer as standards for criminal culpability. Is honest reporting about the government's deliberations about whether to impose, extend, modify, or lift an emergency order intended to cause confusion if the article reflects a confused and uncertain state of affairs? Is an article intended to cause panic if panic is foreseeable in response to news about an impending shutdown? Such a nebulous intent requirement, tied to criminal penalties, necessarily compels people "to steer far wider of the

unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (1972) (alteration in original) (citations and internal quotation marks omitted). In concrete terms, journalists will be reluctant to report unofficial information about the government's emergency response, because the statute's intent standard provides no reliable protection against prosecution or conviction.

Conversely, the law effectively empowers police officers and prosecutors to initiate criminal proceedings against any member of the public whose speech includes real or imagined inaccuracies about government emergency orders. The "need to eliminate the impermissible risk of discriminatory enforcement" is especially important with respect to criminal regulations of speech, "for history shows that speech is suppressed when either the speaker or the message is critical of those who enforce the law." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991) (citations omitted). In this case, 25 L.P.R.A. § 3654(f) is expressly directed to speech about the government's emergency orders. Under these circumstances, concerns about discriminatory enforcement against speakers critical of the government are at their zenith. The law's sweeping intent standard fails to dispel these concerns.

Even if 25 L.P.R.A. § 3654(f) could be construed to prohibit spreading false information with the intent to cause a breach of the peace, it would still be unconstitutionally vague for the reasons laid down by the Supreme Court in *Ashton v. Kentucky*, 384 U.S. 195 (1966). There, the Court held that Kentucky's common law of criminal defamation was unconstitutionally vague, even though it required the government to demonstrate both that the defendant spoke with actual malice and that the statement was "calculated to create disturbances of the peace." 384 U.S. at 200. The Court explained that criminalizing statements "'calculated to create disturbances of the peace' leaves wide open the standard of responsibility," because it "involves calculations as to

28

the boiling point of a particular person or a particular group." *Id.* Likewise, 25 L.P.R.A. §

3654(f) requires members of the press to ascertain in advance, on pain of criminal penalty,

whether their speech would likely cause confusion, panic, or public hysteria in Puerto Rico. It is

not the proper function of the press to make these paternalistic calculations. Rather, it is the

press's duty to inform the public in accordance with standard journalistic practices.

## II.     The Act's Infringement of Plaintiffs' First Amendment Rights Constitutes Irreparable Harm.

Since Plaintiffs "have made a strong showing of likelihood of success on the merits of

their First Amendment claim, it follows that the irreparable injury component of the preliminary

injunction analysis is satisfied as well." *Sindicato Puertorriqueño de Trabajadores*, 699 F.3d at

15. Although the Challenged Provisions have not yet been enforced against Plaintiffs, the mere

threat of prosecution already operates to chill Plaintiffs' speech as well as the speech of their

sources. *See* Rodríguez Cotto Decl. ¶¶ 27–32; González Cotto Decl. ¶¶ 12–19. *See also*

*Mangual*, 317 F.3d at 58 ("[T]here is nothing Mangual can do to limit his exposure other than to

curtail his investigative and journalistic activities."). This pervasive and ongoing chilling effect

satisfies the irreparable harm requirement, because "[t]he loss of First Amendment freedoms, for

even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427

U.S. 347, 373 (1976).

## III.    The Balance of Hardships and the Public Interest Support a Preliminary Injunction.

The balance of hardships and the public interest also tip sharply in favor of a preliminary

injunction vindicating the First Amendment. "First Amendment freedoms must always be

protected; that is why they have a special, separate place in the Constitution." *Firecross*

*Ministries v. Municipality of Ponce*, 204 F. Supp. 2d 244, 250–51 (D.P.R. 2002). Thus, in any

First Amendment case where a plaintiff demonstrates a likelihood of success on the merits, the "balance weighs heavily against Defendants." *Id.* at 251. Along the same lines, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Magriz v. Union de Tronquistas de P.R., Local 901*, 765 F. Supp. 2d 143, 157 (D.P.R. 2011) (quoting *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010)).

In this case, a preliminary injunction is especially important because the threat of prosecution under the Challenged Provisions necessarily chills public discussion about the COVID-19 public health emergency and the government's emergency orders. Although the Challenged Provisions are ostensibly directed toward protecting public health and public order during this emergency, the means adopted to achieve those compelling objectives are not compatible with free speech and a free press. The most important check on the government's exercise of emergency powers is public scrutiny of the government's actions.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction prohibiting Defendant from enforcing 25 L.P.R.A. §§ 3654(a) and (f).

Dated: May 20, 2020

S/ Fermin L. Arraiza-Navas
#215705
farraiza@aclu.org
William Ramirez-Hernández+
American Civil Liberties Union
of Puerto Rico
Union Plaza, Suite 1105
416 Avenida Ponce de León
San Juan, Puerto Rico 00918
(787) 753-9493
(646) 740-3865


Brian Hauss*
Emerson Sykes+
Arianna Demas+
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
bhauss@aclu.org


*Pro hac vice motion forthcoming
+ Of counsel

Counsel for Plaintiffs