UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| SANDRA RODRÍGUEZ COTTO; RAFELLI GONZÁLEZ COTTO, *Plaintiffs*, v. WANDA VÁZQUEZ GARCED, Governor of Puerto Rico; DENNISE NOEMÍ LONGO QUIÑONES, Secretary of Department of Justice of Puerto Rico; PEDRO JANER, Secretary of Puerto Rico Department of Public Safety; HENRY ESCALERA, Puerto Rico Police Commissioner, all in their official capacities, *Defendants*. | CIVIL NO. 20-1235 (PAD) |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM REGARDING SENATE BILL 1582**

Pursuant to the Court's order on June 16, 2020, Dkt. No. 21, Plaintiffs submit this supplemental brief regarding whether Senate Bill 1582 would moot this case if it were enacted into law.

The enactment of Senate Bill 1582 would not moot Plaintiffs' claims or alleviate their injuries. Even under the proposed amendment, Plaintiffs would still face a credible threat of prosecution if the government were to dispute the factual accuracy of their reporting. Furthermore, as discussed below, Senate Bill 1582 would not cure the Challenged Provisions' constitutional defects. If Senate Bill 1582 is enacted into law, or if the Challenged Provisions are otherwise amended, Plaintiffs respectfully request leave to amend the complaint and file a renewed motion for preliminary injunction.

1

## BACKGROUND

Plaintiffs filed this lawsuit on May 20, 2020, challenging two provisions contained in Article 6.14 of the Law of the Puerto Rico Department of Public Safety, P.R. Laws Ann. tit. 25 § 3501, as amended by Act No. 35-2020. Compl., Dkt. No. 1 (challenging Article 6.14(a) and (f), codified at 25 L.P.R.A. §§ 3654(a) and (f). The Challenged Provisions state:

> Any person who performs any of the following acts shall be punished with a penalty of imprisonment not exceeding six (6) months or a fine not exceeding five thousand dollars ($5,000) or both sentences at the discretion of the court:
>
> (a) Give a false alarm regarding the imminent occurrence of a catastrophe in Puerto Rico or, if there is already a state of emergency or disaster, spread rumours or give false alarms about non-existent abnormalities.
>
> (f) Transmit or permit by any means, through any social network or mass media, false information with the intention of creating confusion, panic or collective public hysteria, with respect to any proclamation or executive order decreeing a state of emergency or disaster or curfew. In the event that the dissemination of false information results in harm to the public purse, or to third parties, or public or private property, exceeding ten thousand (10,000) dollars, or where the conduct results in injury or physical harm, the penalty corresponding to that of a felony shall be imposed in fourth degree.

25 L.P.R.A. § 3654(a), Dkt. No. 10-1; *id.* § 3654(f), Dkt. No. 10-2.

On May 26, the Puerto Rico Senate approved Senate Bill 1582 and referred the bill to the Puerto Rico House of Representatives, where it is currently pending. If enacted, Senate Bill 1582 would consolidate and amend the Challenged Provisions. It would eliminate 25 L.P.R.A. § 3654(f), and it would amend 25 L.P.R.A. § 3654(a) to read as follows:

> Any person, natural or legal, who performs any of the following acts on purpose, knowingly or recklessly, having been decreed by Executive Order an emergency or disaster by the Governor of Puerto Rico shall be punished with a penalty of imprisonment not exceeding six (6) months or a fine not exceeding five thousand (5,000) dollars or both sentences at the discretion of the court:
>
> (a) Gives a warning or false alarm, knowing that the information is false, in relation to the imminent occurrence of a catastrophe in Puerto Rico, or, disseminate, publish, transmit, transfer and/or circulate through any means of communication, including the means of television media, social network, and/or any other means of dissemination, publication or

> distribution of information, a notice or a false alarm, knowing that the information is false, when as a result of their conduct it puts the life, health, bodily integrity or safety of one or more persons at imminent risk, or endangers public or private property.
>
> In the event that the notice or false alarm results in damage to the public purse, to third parties, or public or private property exceeding ten thousand (10,000) dollars, or when the conduct results in injury or physical harm of a person, that person shall have committed a felony with a penalty of imprisonment for a fixed term of three (3) years.

Senate Bill 1582, Dkt. No. 24-1.

## ARGUMENT

"The burden of establishing mootness rests with the party urging dismissal," and "[t]his burden is a heavy one." *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 88 (1st Cir. 2008) (citations omitted); *see also, e.g.*, *Karuk Tribe of Cal. v. United States Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc) ("The Supreme Court has emphasized that the doctrine of mootness is more flexible than other strands of justiciability doctrine." (citation omitted)). Where the party asserting mootness rests its argument on its voluntary cessation of its unlawful conduct, that party cannot prevail unless it proves that it is "*absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (per curiam) (quotation marks and citations omitted, emphasis in original); *accord Adams v. Bowater Inc.*, 313 F.3d 611, 613 (1st Cir. 2002).

"An amendment that does not satisfy the principles championed by the plaintiffs ordinarily does not moot a request for prospective relief[.]" 13C Charles Wright & Arthur Miller, Fed. Prac. & Proc. Juris. § 3533.6 & n.63 (3d ed. 2020) (collecting cases). Thus, even if an amended law injures plaintiffs "to a lesser degree than the old one," they still have standing to challenge the amended law, so long as it injures "them in the same fundamental way." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993); *accord, e.g.*, *North Carolina v. Covington*, 138 S. Ct. 2548, 2552–53 (2018); *Davenport v. Washington Educ. Ass'n*, 127 S. Ct. 2372, 2377 n.1 (2007). This is just such a case.

**I.         Senate Bill 1582 Would Not Alleviate Plaintiffs' Reasonable Fear of Prosecution.**

Although Senate Bill 1582 would amend the Challenged Provisions to require the government to demonstrate that the defendant knew their speech was false, that would not guarantee that only intentionally false speech would be prosecuted, nor would it deprive Plaintiffs of standing. The Supreme Court's decision in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) [*SBA List I*], is directly on point. There, an advocacy group filed a pre-enforcement First Amendment challenge to an Ohio statute that made it a crime to utter certain false statements about political candidates or public officials. *Id.* at 152. The Sixth Circuit held that the plaintiff organization's fear of enforcement did not engender an Article III injury because it had "not alleged that 'it plans to lie or recklessly disregard the veracity of its speech' in the future, but rather maintains that the statements it intends to make are factually true." *Id.* at 156–57 (quoting *Susan B. Anthony List v. Driehaus*, 525 F. App'x 415, 422 (6th Cir. 2013)).

The Supreme Court unanimously reversed, observing that the Sixth Circuit "misse[d] the point" of its pre-enforcement standing cases. *Id.* at 163. "Nothing in [those] decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law" by intentionally uttering a false statement. *Id.* (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 301 (1979)). Instead, plaintiffs may establish standing by plausibly alleging that their speech could be construed to violate the challenged statute. Thus, the Court held that the plaintiffs had standing because they could be accused of intentionally uttering a false statement in violation of Ohio's false statement law, even though they did not intend to utter any false statements. *Id.*; *see also, e.g.*, *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003) (holding that a plaintiff's fear of prosecution is sufficiently credible to establish standing if their "intended speech arguably falls within the statute's reach").

4

Like the plaintiffs in *Susan B. Anthony List*, Plaintiffs here would never knowingly publish false statements. Joint Mot. ¶ 23, Dkt. No. 23. However, because their reporting on emergency conditions in Puerto Rico often challenges the Government's own information, *id.* ¶¶ 20–22, they reasonably fear that the government could accuse them of lying, and they could not possibly anticipate every conceivable "consequence" of their reporting. For example, the former Governor's Chief of Staff accused Plaintiff Rodríguez Cotto of exaggerating the death toll of Hurricane Maria. Decl. Sandra Rodríguez Cotto ¶ 17, Dkt. No. 4-1. Although Ms. Rodríguez Cotto was not prosecuted, it is plausible that the Government could prosecute her over similar disputes in the future.[1] The point is that Plaintiffs and other journalists face a palpable and ongoing risk of prosecution under laws criminalizing false statements about emergency conditions—even if those laws require the Government to demonstrate that the defendant knew the speech was false—and their reasonable fear of prosecution compels them to self-censor. *See United States v. Alvarez*, 567 U.S. 709, 736 (2012) (Breyer, J., concurring in the judgment) ("[A] speaker might still be worried about being prosecuted for a careless false statement, even if he does not have the intent required to render him liable.").

Furthermore, Plaintiffs would not need to wait for the Government to initiate prosecutions under Senate Bill 1582 in order to challenge it. "[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996). "[T]he Supreme Court repeatedly has found standing to mount pre-enforcement challenges to laws that had never been enforced." *Rhode Island Ass'n of*

---

[1] Notably, the Government has not disavowed that it would ever prosecute Plaintiffs or other journalists for their reporting on emergency conditions in Puerto Rico. *See, e.g.*, *SBA List I*, 573 U.S. at 165; *Babbitt*, 442 U.S. at 302.

*Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999). In *Babbitt*, for instance, the Court held that the plaintiff unions had standing to challenge a criminal restriction on "dishonest, untruthful, and deceptive [consumer] publicity" campaigns, because the union engaged in consumer publicity campaigns and there was always a risk that it could be accused of dishonesty—even though the challenged provisions had not yet been applied to anyone, and even though the union disavowed any intent to "propagate untruths." 442 U.S. 289, 301–02 (1979).

The Government relies on the Supreme Court's decision in *Younger v. Harris*, 401 U.S. 37 (1971), and the First Circuit's decision in *Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017), to support its mistaken argument that plaintiffs cannot file a pre-enforcement First Amendment challenge against a criminal restriction on speech unless a prosecution is imminent. Surreply 11, 15–17, Dkt. No. 19. Neither case bears the weight the Government places on it. In *Younger*, the Supreme Court held that three putative intervenors lacked standing to participate in a federal lawsuit seeking to enjoin a pending state court prosecution against a third party, John Harris. 401 U.S. at 41–42. The Court explained that the putative intervenors had "not claim[ed] that they have ever been threatened with prosecution [under the challenged statute], that a prosecution is likely, or even that a prosecution is remotely possible" for their intended conduct. *Id.* at 42. The Supreme Court held that the intervenors lacked standing to enjoin Harris's prosecution because their fears were "imaginary or speculative." *Id.* However, *Babbitt* made clear that a plaintiff's fears of prosecution under a challenged statute are *not* imaginary or speculative, even if the statute has never been enforced, so long as the plaintiff's speech could be construed to violate the statue and the statute itself is not moribund. *Babbitt*, 442 U.S. at 302

In *Reddy*, the First Circuit held that an anti-abortion group did not have standing to challenge a law authorizing reproductive health care facilities to demarcate a buffer zone around their entrances, exits, and driveways, and prohibiting protestors from engaging in expressive

6

activities within the demarcated buffer zone on threat of civil penalties. 845 F.3d at 495–96. The First Circuit held that the plaintiffs did not face a "certainly impending" or "substantial risk" of injury under the challenged statute, because none of the reproductive health care facilities in New Hampshire had actually demarcated a buffer zone, which was a "condition precedent" to prosecution under the law. *Id.* at 501, 503. As a result, at the time of adjudication, the challenged statute did not prohibit "the plaintiffs from engaging in expressive activities in whatever public areas they please." *Id.* at 502. Here, by contrast, the Challenged Provisions are already in force, and Senate Bill 1582 does not contain any conditions precedent that would prevent it from taking immediate effect. Furthermore, unlike the plaintiffs in *Reddy*, *id.* at 503, Plaintiffs here have averred that they and their sources are already self-censoring in response to the threat of prosecution under the Challenged Provisions. Dkt. No. 4-1 ¶¶ 27–29, 31–32; Decl. Rafelli González Cotto ¶¶ 12, 14–17, 19, Dkt. No. 4-2. And, if Senate Bill 1582 were enacted, they would continue to self-censor due to fear of prosecution under the amended law.

## II.   Senate Bill 1582 Would Still Be Unconstitutional.

Senate Bill 1582 also would not address Plaintiffs' First and Fourteenth Amendment concerns. The bill would criminalize false speech during a declared emergency under two circumstances: (1) if the defendant "gives a warning or false alarm, knowing that the information is false, in relation to the imminent occurrence of a catastrophe in Puerto Rico," or (2) if the defendant shares "a notice or a false alarm, knowing that the information is false, when as a result of their conduct it puts the life, health, bodily integrity or safety of one or more persons at imminent risk, or endangers public or private property." Dkt. No. 24-1 (emphasis omitted). These provisions would still impose a content-based restriction on speech about matters of public concern, and they would still give government and law enforcement officials unconstitutionally broad discretion to abuse prosecutorial power in pursuit of their personal predilections.

7

First, the prohibition against knowingly giving a false alarm about the imminent occurrence of a catastrophe in Puerto Rico would still be a content-based prohibition on speech about emergency conditions, which are matters of immense public concern. *See* Mem. Supp. Mot. Prelim. Inj. 22–23, Dkt. No. 4-3; Reply Resp. 11–12, Dkt. No. 16. *See also Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016) [*SBA List II*] (holding, after remand from the Supreme Court, that Ohio's law prohibiting knowingly false statements about political candidates was subject to strict scrutiny because it imposed a content-based restriction on core First Amendment speech).[2] Moreover, this provision would not require the Government to demonstrate that speech falsely predicting a catastrophe caused a risk of imminent harm to persons or property, so it would be free to prosecute people for obviously harmless "false alarms"—such as obviously fanciful predictions of the apocalypse. The Government cannot justify such a restriction under strict scrutiny. Dkt. No. 4-3 at 23–25; Dkt. No. 16 at 12–14. *See also, e.g.*, *SBA List II*, 814 F.3d at 475 (holding that Ohio's false statement law was "not narrowly tailored" to the government's interest in preserving fair elections, because it penalized knowingly false statements about political candidates even if there was no plausible risk that they would influence the election).

The bill's second provision would fare no better. This provision would make it a crime to knowingly share a "false alarm" if a "consequence" of the false alarm creates an imminent "risk" of danger to persons or property. Dkt. No. 24-1. This wide-ranging prohibition—which, unlike the first provision, is not limited to false reports of an imminent catastrophe—would create both overbreadth and vagueness problems. It would "leave[] wide open the standard of responsibility,"

---

[2] In fact, the prohibition would establish a viewpoint discriminatory restriction on protected speech, since it would prohibit "false alarms" that a catastrophe is about to occur, while exempting speech falsely reassuring the public that everything is under control. By tipping the scales firmly in favor of "positivity," Senate Bill 1582 would threaten to "silence dissent and distort the marketplace of ideas." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring in part and concurring in the judgment).

because it would predicate criminal liability on the government's assessment of "the boiling point of a particular person or a particular group, not an appraisal of the nature of the comments per se." *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966). It would also effectively establish "an unconstitutional 'heckler's veto'" because it would "allow[] or disallow[] protected speech based merely on the audience's reaction to its content." *March v. Frey*, --- F. Supp. 3d ----, No. 2:15-CV-515-NT, 2020 WL 2044625, at *12 (D. Me. Apr. 28, 2020) (citing *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970)); *see also, e.g.*, *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 252 (6th Cir. 2015) (en banc) ("If the speaker's message does not fall into one of the recognized categories of unprotected speech, the message does not lose its protection under the First Amendment due to the lawless reaction of those who hear it." (footnote omitted)).

Even if this provision were evaluated under intermediate scrutiny, it would fail judicial review. The bill would not require the Government to demonstrate that the defendant foresaw that their speech would cause a risk of imminent harm to persons or property, it does not describe how great the risk needs to be in terms of either likelihood or severity, and it does not require the government to show that significant public harm actually resulted. Thus, like the Challenged Provisions, Senate Bill 1582 would "range[] very broadly[,] [a]nd that breadth means that it creates a significant risk of First Amendment harm." *Alvarez*, 567 U.S. at 736 (2012) (opinion of Breyer, J.). And, like the Challenged Provisions, Senate Bill 1582 would apply to speech on political issues, such as the government's emergency orders, "where although . . . lies are more likely to cause harm, the risk of censorious selectivity by prosecutors is also high." *Id.*

The Government argues that the First Amendment does not protect someone who falsely shouts "Fire!" in a crowded theater in order to cause a panic, Resp. Opp'n 18, Dkt. No. 13, and Plaintiffs do not dispute that aphorism. But, as discussed above, neither provision of Senate Bill 1582 requires the government to demonstrate that the defendant's speech was directed to causing

an imminent panic or that it was likely to incite an imminent panic. Both elements are essential to ensure that the law's threat of criminal penalties does not unduly chill protected expression. *Cf. Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

The Federal Communications Commission's "broadcast hoax rule," 47 C.F.R. § 73.1217, provides an example of a less restrictive regulation. First, it is important to note that the FCC's broadcast hoax rule carries civil, rather than criminal, penalties. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) (in addressing vagueness challenges, the Supreme Court "has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe" (footnote omitted)). Putting that aside, the broadcast hoax rule is still more narrowly tailored to the government's interest in preventing threats to public safety than either the Challenged Provisions or Senate Bill 1582.  The rule states:

> No licensee or permittee of any broadcast station shall broadcast false information concerning a crime or a catastrophe if:
>
> (a) The licensee knows this information is false;
>
> (b) It is foreseeable that broadcast of the information will cause substantial public harm, and
>
> (c) Broadcast of the information does in fact directly cause substantial public harm.
> . . .
> For purposes of this rule, "public harm" must begin immediately, and cause direct and actual damage to property or to the health or safety of the general public, or diversion of law enforcement or other public health and safety authorities from their duties. The public harm will be deemed foreseeable if the licensee could expect with a significant degree of certainty that public harm would occur. A "crime" is any act or omission that makes the offender subject to criminal punishment by law. A "catastrophe" is a disaster or imminent disaster involving [a] violent or sudden event affecting the public.

47 C.F.R. § 73.1217.

Unlike the Challenged Provisions and Senate Bill 1582, the FCC's broadcast hoax rule requires the government to demonstrate that: (1) the false information "concern[s] a crime or a catastrophe," both of which are expressly defined; (2) public harm "beg[a]n immediately" as a result of the broadcast of the false information; and (3) the broadcaster could have "expect[ed] with a significant degree of certainty that public harm would occur." *Id.* The FCC has made clear that these strict limitations on the scope of the broadcast hoax rule are essential to address the "substantial First Amendment concerns involved with the federal government policing the content of broadcast news." Federal Communications Commission, *Letter to Jessica J. González Re: Free Press Emergency Petition for Inquiry Into Broadcast of False Information on COVID-19*, No. DA 20-385, 2020 WL 1686747, at *2 (OHMSV Apr. 6, 2020) (citing *Alvarez*, 567 U.S. at 716 (plurality opinion)).

Those same concerns militate against Senate Bill 1582's substantially overbroad attempt to police public discourse about emergency conditions in Puerto Rico, such as the COVID-19 public health crisis. As the FCC explained in rejecting a request to extend the broadcast hoax rule beyond its narrowly established confines, the news media "face[s] the challenge of covering a rapidly-evolving, national, and international health crisis, in which new information—much of it medical or technical in nature and therefore difficult to corroborate or refute in real time—is continually revealed, vetted, and verified or dismissed." *Id.* Under these complex, evolving, and politically charged circumstances, laws that broadly criminalize false statements about emergency conditions give the Government too much power over public discourse and chill too much reporting on matters of public concern.

## CONCLUSION

Because Senate Bill 1582 would neither alleviate Plaintiffs' well-founded fear of prosecution nor resolve their First and Fourteenth Amendment claims, it would not moot this case. If Senate Bill 1582 is enacted into law, or if the Challenged Provisions are otherwise amended, Plaintiffs respectfully request leave to amend the complaint and file a renewed motion for preliminary injunction.

Respectfully submitted, at San Juan, Puerto Rico, this 24th day of June 2020.

I HEREBY CERTIFY: That on this same date I have served this Memorandum to all defendants through the CM/ECF system which will serve copies to all parties in this case.

*S/Fermin L. Arraiza-Navas*
FERMÍN L. ARRAIZA NAVAS
USDC-PR No. 215705
William Ramirez-Hernández+
American Civil Liberties Union
 of Puerto Rico
Union Plaza
416 Avenida Ponce de León, Suite 1105
San Juan, Puerto Rico 00918
(787) 753-9493; (646) 740-3865
farraiza@aclu.org

Brian Hauss*
Emerson Sykes+
Arianna Demas+
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
bhauss@aclu.org

*Pro hac vice
+ Of counsel
Attorneys for Plaintiffs