# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

SANDRA RODRÍGUEZ COTTO;
RAFELLI GONZÁLEZ COTTO,

        *Plaintiffs*,

        v.

WANDA VÁZQUEZ GARCED, Governor of
Puerto Rico; INÉS DEL C. CARRAU-
MARTÍNEZ, Interim Secretary of Department
of Justice of Puerto Rico; PEDRO JANER,
Secretary of Puerto Rico Department of Public
Safety; HENRY ESCALERA, Puerto Rico
Police Commissioner, all in their official
capacities,

        *Defendants*.

Civil Action No.: 3:20-01235-PAD

 

**Memorandum in Support of Plaintiffs' Renewed Motion for Preliminary Injunction**

## INTRODUCTION

Plaintiffs Sandra D. Rodríguez Cotto and Rafelli González Cotto brought this lawsuit challenging Section 6.14 of the Puerto Rico Department of Public Safety Act, which criminalizes the dissemination of false information about emergency conditions in Puerto Rico. Plaintiffs—investigative journalists who report frequently on the COVID-19 public health emergency—are challenging the constitutionality of Section 6.14 because the risk of criminal prosecution under the provision threatens to chill a great deal of true speech on matters of immense public concern, including Plaintiffs' own reporting. After Plaintiffs' initial motion for preliminary injunction was fully briefed, the Government of Puerto Rico enacted Act No. 66-2020, which substantially amended Section 6.14. Unfortunately, the amendments to Section 6.14 have not cured the statute's constitutional defects. Plaintiffs therefore submit this renewed motion for a preliminary injunction against the amended statute.

Plaintiffs are likely to succeed in demonstrating that Section 6.14(a) continues to violate their rights under the First and Fourteenth Amendments to the U.S. Constitution. First, Plaintiffs have standing to challenge the amended statute because the statute facially regulates the subject matter of Plaintiffs' reporting—emergency conditions in Puerto Rico during the COVID-19 public health crisis. Although the amended statute prohibits only knowingly false speech, that does not mean that only liars are at risk of prosecution. As the Supreme Court recognized in *Susan B. Anthony List v. Driehaus* [*SBA List I*], 573 U.S. 149, 159 (2014), and *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979), there is often a substantial risk that honest speakers will be wrongly prosecuted under laws that prohibit knowingly false speech on specified topics. Numerous factors support Plaintiffs' reasonable fear of prosecution under Section 6.14(a), including: the government's recent prosecution of Pastor José Luis Rivera Santiago for allegedly disseminating false information about a rumored government curfew

order; the government's refusal to stipulate that it would not prosecute Plaintiffs for even a short period of time while Act No. 66-2020 was awaiting the Governor's signature; Act No. 66-2020's Statement of Purpose, which makes clear that the statute is directly addressed to speech by the "mass media" (i.e., the press); and the fact that police departments have decentralized authority to initiate misdemeanor prosecutions under Section 6.14 without the Department of Justice's involvement. Taken together, these factors support the existence of a credible threat of prosecution against Plaintiffs.[1]

Second, Plaintiffs are likely to succeed in demonstrating that Section 6.14(a) is facially unconstitutional. The law's first provision, which prohibits the dissemination of "warning[s]" or "false alarm[s]" about the imminent occurrence of a catastrophe in Puerto Rico, is facially content based because it applies only to speech about a particular topic. Certified Transl. of Act No. 66-2020, Dkt. No. 45-1. Indeed, this provision is viewpoint based because it criminalizes speech falsely warning that a catastrophe is about to occur, while exempting speech falsely reassuring the public that everything is fine, even though both types of speech have the potential to threaten public safety. The provision cannot survive the stringent scrutiny applied to laws that restrict speech on the basis of its content and viewpoint, or even the more lenient scrutiny applied to content-neutral restrictions on speech, because it is not narrowly tailored to the government's interest in public safety. Indeed, it does not even require the government to show that the offending speech was likely to result in, or actually resulted in, substantial threats to

---

[1] The Court has ordered Plaintiffs to address whether Plaintiffs must disclose their sources' identities in order to establish standing. As discussed in Section I.B, *infra*, there is no justification for discovery into Plaintiffs' confidential sources, because the existence of a credible threat of prosecution is the sole criterion for standing in a pre-enforcement First Amendment challenge to a criminal restriction on speech. Allowing discovery into Plaintiffs' confidential sources would also inflict the very harm that Plaintiffs sought to avoid by filing this lawsuit—namely, the compelled disclosure of confidential information and irreversible damage to Plaintiffs' access to sources.

public safety. As a result, the provision gives the government far too much leeway to prosecute protected speech that poses no actual risk of causing substantial public harm.

Section 6.14(a)'s second provision—which makes it a crime to knowingly disseminate false information during a declared emergency if it "result[s]" in an "imminent risk" of harm to persons or property—poses distinct, though equally formidable, dangers to free expression. *Id.* This provision establishes an unconstitutional heckler's veto, authorizing prosecutions against protected speech on the basis of the government's forecasts about whether the speech is likely to result in an unspecified "risk" of "harm" to persons or property. Furthermore, it does not require the government to demonstrate either that the defendant knew that their speech would result in an imminent risk of harm or that harm actually occurred. This restriction criminalizes much more protected speech than is necessary to vindicate the government's asserted interest in public safety. The Federal Communications Commission's broadcast hoaxes rule, 47 C.F.R. § 73.1217, provides a contrasting example of a restriction that vindicates the same governmental interest in public safety without burdening nearly as much protected speech.

Finally, because Plaintiffs are likely to succeed in demonstrating that Section 6.14(a) violates their First Amendment rights, they presumptively satisfy the remaining preliminary injunction requirements. The threat that Section 6.14(a) will chill Plaintiffs' exercise of their First Amendment rights is sufficient to establish irreparable harm. Both the balance of equities and the public interest support the vindication of First Amendment rights, especially the right to a free press, which is a fundamental public good. Additionally, because a preliminary injunction would vindicate Plaintiffs' First Amendment rights and the public interest, the Court should waive any bond requirement under Federal Rule of Civil Procedure 65(c).

## BACKGROUND

### This Lawsuit

Plaintiffs filed this lawsuit on May 20, 2020, challenging two provisions contained in Article 6.14 of the Law of the Puerto Rico Department of Public Safety, 25 L.P.R.A. § 3501 *et seq.*, as amended by Act No. 35-2020. Compl., Dkt. No. 1 (challenging Article 6.14(a) and (f), codified at 25 L.P.R.A. §§ 3654(a) and (f)). The Challenged Provisions provided as follows:

> Any person who performs any of the following acts shall be punished with a penalty of imprisonment not exceeding six (6) months or a fine not exceeding five thousand dollars ($5,000) or both sentences at the discretion of the court:
>
> (a) Give a false alarm regarding the imminent occurrence of a catastrophe in Puerto Rico or, if there is already a state of emergency or disaster, spread rumours or give false alarms about non-existent abnormalities.
>
> (f) Transmit or permit by any means, through any social network or mass media, false information with the intention of creating confusion, panic or collective public hysteria, with respect to any proclamation or executive order decreeing a state of emergency or disaster or curfew. In the event that the dissemination of false information results in harm to the public purse, or to third parties, or public or private property, exceeding ten thousand (10,000) dollars, or where the conduct results in injury or physical harm, the penalty corresponding to that of a felony shall be imposed in fourth degree.

Certified Transl. of 25 L.P.R.A. § 3654(a), Dkt. No. 10-1; Certified Transl. of 25 L.P.R.A. § 3654(f), Dkt. No. 10-2. Plaintiffs also moved for a preliminary injunction. Dkt. No. 4. Plaintiffs incorporate by reference the factual background included in their memorandum in support of their original preliminary injunction motion. *See* Mem. of Law Supp. Pls.' Mot. for Prelim. Inj. 9–17, Dkt. No. 4-3.

On May 26, the Puerto Rico Senate approved Senate Bill 1582, which proposed a substantial amendment to the challenged provisions, and referred the bill to the Puerto Rico House of Representatives. *See* Certified Transl. of Senate Bill 1582, Dkt. No. 24-1. The bill was

still pending in the Puerto Rico House of Representatives when the parties completed their briefing on Plaintiffs' original preliminary injunction motion.

On June 23, the day before the hearing on Plaintiffs' preliminary injunction motion, the Court conducted a status conference between the parties to determine how to proceed. *See* Minutes of Proceedings: Status Conference, Dkt. No. 28. The minutes of the June 23 status conference reflect that Defendants asked the Court to stay consideration of Plaintiffs' preliminary injunction motion pending the imminent enactment of Senate Bill 1582. The parties discussed "[t]he possibility of entering into a stipulation whereby defendants would agree that no adverse action will be taken against plaintiffs or any other journalist under the challenged law, until Bill 1582 is signed into law . . . ." *Id.* at 4. Defendants demurred, claiming that such stipulations were unnecessary. Defendants further argued that, if the Court were to order them to consider proposed stipulations of non-prosecution against Plaintiffs or other journalists, Defendants would need at least four working days to consider the proposal. "The court stated it will not issue any order as to this matter.  However, it noted that based on counsels' repeated representations, it is confident that defendants will not initiate any adverse action or prosecution against plaintiffs under the challenged law pending approval and signature of Bill 1582." *Id.*

The next day, Defendants filed a motion to amend the minutes of the status conference. *See* Mot. for Clarification and/or to Amend Min. of Proceedings, Dkt. No. 31. In their motion to amend the minutes, Defendants objected to the record of their representation that "[t]he government will not prosecute any journalist under the challenged law." *Id.* at 2. Defendants argued that "this statement leads to confusion and should be clarified to reflect the argument made during the Status Hearing." *Id.* Defendants stated that although "journalists would not and could not be prosecuted for publishing journalistic articles adverse to the Government of Puerto

Rico because that conduct is not proscribed by the challenged provisions nor it is within its reach," they would need at least four working days to discuss whether "any compromise from the Department of Justice of not prosecuting a group of citizens (journalists) or Plaintiffs under the challenged provisions" could be accepted. *Id.* Defendants asked the Court to amend the minutes to clarify that Defendants "did not intend to make any representation that the Department of Justice would not prosecute a citizen that commits the proscribed conduct in the challenged provisions." *Id.* at 4.

Later that day, the Court issued a text order denying Defendants' motion to amend the minutes. Order, Dkt. No. 32. The text order stated "The Minutes of Proceedings accurately describe the arguments and representations the parties made during the Status Conference. Consequently, there is no need to amend or clarify the Minutes. Nevertheless, the court notes the narrowing construction of the defendants' original representations, and takes it as defendants' official position as of today on this matter." *Id.*

## Act No. 66-2020

On July 13, Governor Vázquez Garced signed Senate Bill 1582 into law as Act No. 66-2020. The Statement of Purpose for Act No. 66-2020 summarizes and reaffirms the concerns that led the Government of Puerto Rico to enact Sections 6.14(a) and (f). It states that it is "important that the people are warned of both the powers of public security agencies and the prohibited conduct, once an emergency or disaster is duly declared by Executive Order." Certified Transl. of Act No. 66-2020, Dkt. No. 45-1. It also reiterates "the need to prohibit people from using social media or **mass media** to disseminate false information, with the intention of creating confusion, panic or collective public hysteria in our country while a state of emergency, disaster, or curfew is in force," because "[s]uch conduct undermines the safety of the people and social

order, and endangers the health and lives of citizens." *Id.* at 1 (emphasis added). The Statement of Motives confirms that the purpose of Act No. 66-2020 was simply "to clarify [the] scope and application [of Section 6.14], as well as to harmonize its provisions." *Id.*

Act No. 66-2020 accordingly amended Section 6.14(a) to provide as follows:

> Any person, natural or legal, who shall perform any of the following acts on purpose, knowingly or recklessly after the Governor of Puerto Rico has decreed by Executive Order an emergency or disaster, shall be punished with a penalty of imprisonment not exceeding six (6) months or a fine not exceeding five thousand dollars ($5,000) or both sentences at the discretion of the court:

> (a) Gives a warning or false alarm, knowing that the information is false, in relation to the imminent occurrence of a catastrophe in Puerto Rico, or disseminates, publishes, transmits, transfers or circulates through any means of communication, including the media, social networks, or any other means of dissemination, publication or distribution of information, a notice or a false alarm, knowing that the information is false, when as a result of its conduct it puts the life, health, bodily integrity or safety of one or more persons at imminent risk, or endangers public or private property.

> In the event that the notice or false alarm results in damage to the public purse, to third parties, or public or private property exceeding ten thousand dollars ($10,000), or where the conduct results in injury or physical harm of another, that person shall have committed a felony with a penalty of imprisonment for a fixed term of three (3) years.

*Id*. at 2. Act No. 66-2020 also eliminated Section 6.14(f). Although this lawsuit had been pending for nearly two months when Act No. 66-2020 was enacted into law, the Act did not amend Section 6.14(a) to include any exemption for journalists.

**The Continuing Threat of Prosecution Under Section 6.14(a) and Its Chilling Effect**

As set forth in the memorandum of law supporting Plaintiffs' original preliminary injunction motion, Dkt. No. 4-3 at 14–17, Plaintiffs fear prosecution under Section 6.14 for their

reporting on emergency conditions in Puerto Rico. First Decl. of Sandra D. Rodríguez Cotto ¶¶ 26–32, Dkt. No. 4-1 ("First Rodríguez Cotto Decl."); First Decl. of Rafelli González Cotto ¶¶ 12–19, Dkt. No. 4-2 ("First González Cotto Decl."). Plaintiffs' fear of prosecution under Section 6.14 was informed by the history of prosecutions against journalists under Puerto Rico's criminal defamation law, as well as Pastor Rivera Santiago's recent prosecution under Section 6.14(a) for sharing information about a rumored curfew order—speech addressed to the same subjects as Plaintiffs' own investigative reporting. First Rodríguez Cotto Decl. ¶ 26; First González Cotto Decl. ¶ 11. After the lawsuit was filed, Plaintiffs' fear of prosecution was exacerbated when they learned that the government declined to stipulate that it would not prosecute them under Section 6.14, even for the short period between the Court's status conference on June 23 and the enactment of Senate Bill 1582. *See* Ex. A, Second Decl. of Sandra D. Rodríguez Cotto ¶ 4 ("Second Rodríguez Cotto Decl."); Ex. B, Second Declaration of Rafelli González Cotto ("Second González Cotto Decl.") ¶ 4.

Plaintiffs still face a credible threat of prosecution under Section 6.14(a), as amended by Act No. 66-2020, and this threat of prosecution continues to chill their reporting on emergency conditions in Puerto Rico. Although Plaintiffs make every effort to confirm the accuracy of their reporting, in accordance with standard journalistic practices, developing stories on matters of immense public concern are often complex, contentious, and murky. Second Rodríguez Cotto Decl. ¶ 6; Second González Cotto Decl. ¶ 6. Plaintiffs recognize that inadvertent inaccuracies are inevitable even in the most thoroughly vetted reporting. Plaintiffs are afraid that the government could prosecute them under Section 6.14(a) by alleging that an inadvertent inaccuracy in their reporting was intentional. Plaintiffs are also afraid that that they could be prosecuted under

Section 6.14(a) for speech that the government deems to be false, especially speech that casts the government in a bad light, even if the speech is not demonstrably false.

The other limitations imposed by Section 6.14(a) do not meaningfully limit the statute's scope. Plaintiffs are unable to determine what constitutes a "warning" or a "false alarm" under Section 6.14(a). Second Rodríguez Cotto Decl. ¶ 7; Second González Cotto Decl. ¶ 7. Plaintiffs are also unable to determine in advance whether the public response to their reporting might somehow "endanger[] public or private property" or cause "imminent risk" to one or more persons; indeed, Plaintiffs cannot ascertain how the government proposes to determine whether such a risk actually exists. As a result, Plaintiffs must assume that they can be prosecuted under Section 6.14(a) for any speech related to public emergencies in Puerto Rico that the government deems to be knowingly false.

The credible threat of prosecution under Section 6.14(a) will chill Plaintiffs' reporting on emergency conditions in Puerto Rico. Second Rodríguez Cotto Decl. ¶ 8; Second González Cotto Decl. ¶ 8. For instance, Plaintiffs will be less likely to discuss information that is controversial or that has not been verified by the government. Even when they do report on such matters, the threat of prosecution will affect their reporting in numerous ways, including how many confirmations they need before publication, what information they include, and even what words they use. The threat of prosecution under Section 6.14(a) will also interfere with Plaintiffs' access to sources. Second Rodríguez Cotto Decl. ¶ 9; Second González Cotto Decl. ¶ 9. In many cases, the only way for a journalist to successfully defend a prosecution under Section 6.14(a) would be to reveal the sources on which their reporting was based. Sources who do not want their identities to be revealed—whether because they fear prosecution themselves, fear for their

safety, or fear negative personal or professional repercussions—will be chilled from speaking with journalists.

## ARGUMENT

When assessing a motion for preliminary injunction, this Court must consider four factors: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm; (3) the balance of the equities; and (4) the public interest. *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012). As discussed below, each of the four factors supports Plaintiffs' motion for a preliminary injunction against Section 6.14(a).

## I.   Likelihood of Success on the Merits

### A.  Plaintiffs are likely to succeed in demonstrating that they have standing.

Although Plaintiffs have not been personally prosecuted or threatened with prosecution under Section 6.14(a), such a threat is not necessary for them to vindicate their First and Fourteenth Amendment rights. "[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459, (1974). In the context of facial pre-enforcement challenges, the Supreme Court has "held that a plaintiff satisfies the injury-in-fact requirement where he alleges '[1] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [2] proscribed by a statute, and [3] there exists a credible threat of prosecution thereunder.'" *SBA List I*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). Plaintiffs satisfy all three prongs of this relaxed standard.

Plaintiffs' intended speech is plainly "affected with a constitutional interest." *Id.* at 161 (citation and internal quotation marks omitted). Plaintiffs have alleged an intention to continue reporting on emergency conditions in Puerto Rico, including the COVID-19 public health crisis. Second Rodríguez Cotto Decl. ¶ 3; Second González Cotto Decl. ¶ 3. Reporting on "subject[s] of legitimate news interest" constitutes "[s]peech on matters of public concern," which lies "at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–53 (2011) (citations and internal quotation marks omitted); *see also Mangual v. Rotger-Sabat*, 317 F.3d 45, 64–65 (1st Cir. 2003).

Plaintiffs' intended speech is also "'arguably . . . proscribed by [the] statute' they wish to challenge." *SBA List I*, 573 U.S. at 162 (citation omitted) (alteration in original).  Section 6.14(a) makes it a crime to knowingly transmit false information about emergency conditions in Puerto Rico during a declared emergency. Governor Vázquez has declared a public emergency relating to the COVID-19 pandemic, thus bringing Section 6.14 into full force and effect for the duration of the crisis. Joint Factual Stipulation ¶ 3, Dkt. No. 23. And Plaintiffs' reporting currently focuses on all aspects of the COVID-19 public health emergency, including the government's response to the emergency. *Id.* ¶¶ 28, 36; Second Rodríguez Cotto Decl. ¶ 3; Second González Cotto Decl. ¶ 3. Section 6.14(a) therefore "covers the subject matter of [Plaintiffs'] intended speech." *See SBA List I*, 573 U.S. at 162.

Plaintiffs need not allege that they intend to actually violate Section 6.14(a)—i.e., by knowingly publishing false statements about emergency conditions in Puerto Rico—in order to establish that their speech is *arguably* proscribed by the Act. The Supreme Court's decision in *SBA List I* is directly on point. There, an advocacy group filed a pre-enforcement First Amendment challenge to an Ohio statute that made it a crime to utter certain false statements

about political candidates or public officials. *Id.* at 152. The Sixth Circuit held that the plaintiff organization's fear of enforcement did not engender an Article III injury because it had "not alleged that 'it plans to lie or recklessly disregard the veracity of its speech' in the future, but rather maintains that the statements it intends to make are factually true." *Id.* at 156–57 (quoting *Susan B. Anthony List v. Driehaus*, 525 F. App'x 415, 422 (6th Cir. 2013)).

The Supreme Court unanimously reversed, observing that the Sixth Circuit "misse[d] the point" of its pre-enforcement standing cases. *Id.* at 163. "Nothing in [those] decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law" by intentionally uttering a false statement. *Id.* (citing *Babbitt*, 442 U.S. at 301). Instead, plaintiffs may establish standing by plausibly alleging that their speech could be construed to violate the challenged statute. Thus, the Court held that the plaintiffs had standing because they could be accused of intentionally uttering a false statement in violation of Ohio's false statement law, even though they did not intend to utter any false statements. *Id.* The same principle applies here. Although Plaintiffs would never knowingly publish false statements, they reasonably fear that the government could accuse them of lying about emergency conditions in Puerto Rico and prosecute them under Section 6.14(a). Because assessments about another person's state of mind are often inaccurate, "[a] speaker might still be worried about being prosecuted for a careless false statement, even if he does not have the intent required to render him liable." *United States v. Alvarez*, 567 U.S. 709, 736 (2012) (Breyer, J., concurring in the judgment).

Finally, Plaintiffs face a credible threat of prosecution under Section 6.14(a), even though they have not yet been threatened with prosecution under the new law. "[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially

restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996). Because Section 6.14(a) was amended just over two weeks ago, while this lawsuit was already pending, the presumption supporting a credible threat of prosecution is at its zenith.

Furthermore, the evidence strongly supports the existence of a credible threat of prosecution. The government recently attempted to prosecute Pastor Rivera Santiago under the prior version of Section 6.14(a) for sharing information on WhatsApp about a rumored government curfew order. First Rodríguez Cotto Decl. ¶ 26; First González Cotto Decl. ¶ 11; Transl. of News Articles, Dkt. No. 10-3; Joint Stipulation of Facts ¶ 7, Dkt. No. 23. There is nothing to suggest that Plaintiffs, who frequently report on similar topics, are immune from prosecution. Indeed, the government expressly refused to stipulate—even for a few days—that it would not prosecute Plaintiffs under the prior version of Section 6.14(a). *See Babbitt*, 442 U.S. at 302 (noting that the plaintiffs' standing was supported by the fact that "the State ha[d] not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices"); *accord SBA List I*, 573 U.S. at 165; *N.H. Right to Life*, 99 F.3d at 17.

Although Section 6.14(a) was subsequently amended by Act No. 66-2020, the amended statute still does not "carve out any exception for journalists." *Mangual*, 317 F.3d at 58. In fact, the Statement of Motives for Act No. 66-2020 makes clear that the statute is addressed to the "mass media." Certified Transl. of Act No. 66-2020, Dkt. No. 45-1. And the amended version of Section 6.14(a) expressly applies to speech distributed through "the media" and "social networks," where Plaintiffs routinely broadcast their reporting about the COVID-19 public health emergency. Joint Factual Stipulation ¶¶ 10–16, 31–35 (listing Plaintiffs' online

publications, including publications on Facebook, about the COVID-19 public health crisis), Dkt. No. 23; First Rodríguez Cotto Decl. ¶ 4 (stating that Ms. Rodríguez Cotto broadcasts a syndicated radio show). Thus, Section 6.14(a) "facially restrict[s] expressive activity by the class to which . . . [Plaintiffs] belong[]." *N.H. Right to Life*, 99 F.3d at 15.

"Even if the Department of Justice did disavow any intention to prosecute" Plaintiffs or other journalists under Section 6.14(a), Plaintiffs "would still have a credible fear of having criminal charges filed against [them] by the local police." *Mangual*, 317 F.3d at 59. Violations of Section 6.14(a) are treated as misdemeanors, unless the speech results in physical harm to persons or more than $10,000 in property damage. "Under Puerto Rico law, if the crime is a misdemeanor, individuals may file a complaint with the police or pro se; it is after probable cause is shown and the matter is set for trial that the Justice Department steps in to prosecute the case." *Id.* Furthermore, the Secretary of Justice "exercises no control over whom the local police choose to prosecute for misdemeanors." *Id.* Thus, the credible threat of prosecution in this case "is bolstered by the fact that authority" to initiate criminal proceedings under Section 6.14(a) is not limited to licensed prosecutors, "who are constrained by explicit guidelines or ethical obligations." *SBA List I*, 573 U.S. at 164. Plaintiffs' "credible fear of being haled into court on a criminal charge" by a hostile or inept police prosecutor "is enough for the purposes of standing, even if it were not likely that [they] . . . would be convicted." *Mangual*, 317 F.3d at 59.

### B. Plaintiffs should not be forced to disclose their confidential sources in order to vindicate their First and Fourteenth Amendment rights.

In its Memorandum and Order of July 6, 2020, the Court ordered Plaintiffs to include in the legal memorandum supporting their renewed motion for preliminary injunction a "discussion of whether a journalist claiming chilling of sources as basis for standing in a pre-enforcement facial challenge under the First Amendment" may establish standing without disclosing the

identities of their sources. Mem. and Order 2, Dkt. No. 34. The Court further ordered Plaintiffs to "include cases specifically addressing this question." *Id.* Plaintiffs respectfully submit that they may establish standing without disclosing the identities of their sources, and that any order requiring them to disclose the identities of their confidential sources would impermissibly undermine the First Amendment interests they seek to vindicate through this lawsuit.

Although the First Circuit has not resolved the "semantic[] question of whether the protection afforded to a journalist's sources and research is a type of privilege," *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 716 (1st Cir. 1998) (alteration in original), it nonetheless applies a "heightened sensitivity to First Amendment concerns and invite[s] a balancing of considerations" when journalists are asked to divulge such confidential information. *In re Special Proceedings*, 373 F.3d 37, 45 (1st Cir. 2004) (citation and internal quotation marks omitted). The party seeking disclosure of the confidential information bears the initial burden of "showing that his claim of need and relevance is not frivolous." *Cusumano*, 162 F.3d at 716; *see also In re Special Proceedings*, 373 F.3d at 45 ("[T]he disclosure of a reporter's confidential sources may not be compelled unless directly relevant to a nonfrivolous claim or inquiry undertaken in good faith."). The burden then "shifts to the objector to demonstrate the basis for withholding the information." *Cusumano*, 162 F.3d at 716. Ultimately, the Court must balance "those factors that relate to the movant's need for the information on one pan of the scales and those that reflect the objector's interest in confidentiality and the potential injury to the free flow of information that disclosure portends on the opposite pan." *Id.*

In this case, the balance tips decisively against compelled disclosure. On the one hand, the identities of Plaintiffs' sources are irrelevant to the standing inquiry. As the First Circuit explained in *New Hampshire Right to Life*, "two potential injuries must be considered" when "a

15

party launches a pre-enforcement challenge to a statute that provides for criminal penalties and claims that the statute, on its face, abridges First Amendment rights." 99 F.3d at 13. "First, there is the injury which attends the threat of enforcement. . . . [A] credible threat of present or future prosecution itself works an injury that is sufficient to confer standing, even if there is no history of past enforcement." *Id.* Second, "an actual injury can exist when the plaintiff[s]"—and, in this case, their sources—are "chilled from exercising [their] right to free expression or forgo[] expression in order to avoid enforcement consequences." *Id.* at 13. "Either injury is justiciable." *Id.* at 14. Furthermore, "[b]ecause the threat of prosecution is a common denominator of both types of injury, their existence can be resolved in a single inquiry"—the three-factor test laid out by the Supreme Court in *Babbitt* and *SBA List I. N.H. Right to Life*, 99 F.3d at 14. In other words, a credible threat of prosecution is both necessary and sufficient to establish standing in a pre-enforcement First Amendment challenge. For the reasons set forth in Section I.A, *supra*, Plaintiffs have established that they face a credible threat of prosecution under Section 6.14(a).

The First Circuit's decision in *Mangual* lends further support to this conclusion. There, the court held that the plaintiff journalist had made "a sufficient showing of a credible threat of prosecution to secure standing under Article III." 317 F.3d at 59. The credible threat of prosecution against Mangual gave rise to three distinct types of injury: (1) the threat that Mangual would in fact be prosecuted "for continuing his work as a journalist," (2) Mangual's need to "curtail his investigative and journalistic activities" in order "to limit his exposure" to the credible threat of prosecution, and (3) the risk that the Mangual's "sources will silence themselves if he is criminally prosecuted and forced to disclose his sources to prove the truth of his allegations." *Id.* at 58. The court concluded that "[t]he threat of prosecution against Mangual, and the ensuing chilling effect, certainly exceed the low probability threshold required for First

16

Amendment standing purposes." *Id.* As far as Plaintiffs can ascertain, there was never any discovery into the identities of Mangual's sources. To the contrary, the First Circuit's brief discussion of the source chill issue simply relates that "Mangual also *says* there is a *danger* his sources will silence themselves if he is criminally prosecuted." *Id.* (emphases added). Discovery into Mangual's sources was unnecessary because the credible threat of prosecution against Mangual was the sole touchstone for standing.

So too here, Plaintiffs' standing derives from the credible threat of prosecution they face under Section 6.14(a). As in *Mangual*, the threat of prosecution inevitably gives rise to further injuries, including Plaintiffs' self-censorship of their own reporting and the chilling effect on Plaintiffs' sources. But these injuries are derivative of the underlying threat of prosecution, which alone suffices to establish standing. Furthermore, discovery into the identities of Plaintiffs' sources would not resolve any factual issues. Plaintiffs cannot know the identities of potential sources who have been chilled from speaking to them. And even if the government were able to depose Plaintiffs' existing sources, there is no reason to believe that Plaintiffs' sources would actually disclose any material information regarding the existence of source chill. In short, discovery into the identities of Plaintiffs' sources is extremely unlikely to lead to any information relevant to Plaintiffs' allegation that their sources will be chilled by Section 6.14(a).

On the other hand, discovery into the identities of Plaintiffs' confidential sources would itself chill existing and potential sources from sharing further confidential information with Plaintiffs, fatally undermining Plaintiffs' ability to engage in newsgathering and depriving the public of access to important information. "If [journalists' unpublished materials] were freely subject to subpoena, their sources likely would refuse to confide in them . . . [A] drying-up of sources would sharply curtail the information available to [journalists] and thus would restrict

their output . , , [S]tripped of sources, [journalists] would write fewer, less incisive articles." *Cusumano*, 162 F.3d at 714. *See also, e.g.*, *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) ("[S]ociety's interest in protecting the integrity of the newsgathering process, and in ensuring the free flow of information to the public is an interest of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." (citation and internal quotation marks omitted)).

Thus, discovery into Plaintiffs' sources would inflict the same injuries that Plaintiffs' lawsuit seeks to prevent. It would also negate the entire rationale on which the need for discovery is predicated. If Plaintiffs were forced to disclose the identities of their confidential sources, there would be no need to investigate the question of source chill in discovery—the damage would already be done. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958) (holding that the NAACP could assert its members' privacy interests without disclosing their individual identities, because requiring disclosure "would result in nullification of the right at the very moment of its assertion"). Allowing discovery into Plaintiffs' sources under these circumstances would also effectively negate source chill as a cognizable Article III injury. No journalist would ever allege source chill if doing so opened the door to discovery into their sources' identities or other confidential information.

### C. Plaintiffs are likely to succeed in demonstrating that Section 6.14(a)'s first provision is unconstitutional.

Section 6.14(a)'s first provision is facially unconstitutional because it imposes a content- and viewpoint-based restriction on speech about matters of public concern. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). "Government regulation of speech is content based if a law applies to

particular speech because of the topic discussed or the idea or message expressed. . . . This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (citations omitted); *accord Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020). A law is facially content based "if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (quoting *F.C.C. v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)). Content-based laws are presumptively unconstitutional and are subject to strict judicial scrutiny. *Reed*, 135 S.Ct. at 2226–27. This "is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

Section 6.14(a)'s first provision is indisputably content based. This provision makes it a crime to "[g]ive[] a warning or false alarm, knowing that the information is false, in relation to the imminent occurrence of a catastrophe in Puerto Rico." Certified Transl. of Act No. 66-2020. In fact, the prohibition is viewpoint based, since it imposes a blanket prohibition against "warning[s] or false alarm[s]" that a catastrophe is about to occur, without imposing a similar blanket restriction on speech falsely reassuring the public that everything is under control—even though false assurances can pose just as much of a threat to public safety as false alarms. By tipping the scales firmly in favor of "positivity," Section 6.14(a) threatens to "silence dissent and distort the marketplace of ideas." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring in part and concurring in the judgment). Like the anti-disparagement provision of the Lanham Act, which the Supreme Court held to be impermissibly viewpoint-based in *Matal*,

Section 6.14(a)'s first provision is a "happy-talk clause" that "goes much further than is necessary to serve the interests asserted." *Id.* at 1765 (plurality opinion).

As a facially content- and viewpoint-based restriction on speech about matters of public concern, Section 6.14(a)'s first provision must survive strict scrutiny. All of the Supreme Court Justices in *Alvarez* agreed that, at the very least, content-based restrictions on knowingly false speech about matters of public concern must receive strict scrutiny, because allowing "the state to be the arbiter of truth" on such matters "would present a grave and unacceptable danger of suppressing truthful speech." *Id.* at 751–52 (Alito, J., dissenting); *accord id.* at 731–32 (Breyer, J., concurring in the judgment). *See also Alvarez*, 567 U.S. at 723 (plurality op.) (stating that content-based restrictions on false statements should receive strict scrutiny, so long as the speech does not fall into one of the recognized exceptions to the First Amendment, because "[o]ur constitutional tradition stands against" the government's asserted authority "to compile a list of subjects about which false statements are punishable"). On remand in *Susan B. Anthony List v. Driehaus*, the Sixth Circuit applied *Alvarez* and held that Ohio's law prohibiting knowingly false statements about political candidates was subject to strict scrutiny because it imposed a content-based restriction on core First Amendment speech. *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016) [*SBA List II*]. Here, as well, *Alvarez* compels the application of strict scrutiny to Section 6.14(a)'s content-based restriction on speech about matters of immense public concern. The dangers of allowing the government to set itself up as the arbiter of truth on these issues, and the concomitant chill on truthful speech, are severe.

Strict scrutiny requires the government to demonstrate that the restriction is both "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987). To carry its burden under strict

scrutiny, the government "must specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011) (citations and internal quotation marks omitted). Furthermore, the government must demonstrate that any "plausible, less restrictive alternative would be ineffective" in achieving its compelling goals. *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 824 (2000). Throughout, the government's showing must be supported by record evidence, not "anecdote and supposition." *Id.* at 822. Even under intermediate scrutiny, the government must demonstrate that Section 6.14(a) is reasonably proportionate to the government's asserted justifications for the statute, taking into account "the seriousness of the speech-related harm the provision will likely cause, the nature and importance of the provision's countervailing objectives, the extent to which the provision will tend to achieve those objectives, and whether there are other, less restrictive ways of doing so." *Alvarez*, 567 U.S. at 730 (opinion of Breyer, J.).

Section 6.14(a)'s first provision cannot survive strict, or even intermediate, scrutiny. There is no evidence in the legislative record to support the government's assertion that a criminal prohibition against "warnings or false alarms" about the imminent occurrence of catastrophes in Puerto Rico is necessary to advance the statute's asserted interest in "the safety of the people and social order." Certified Transl. of Act No. 66-2020, Dkt. No 45-1. *See Alvarez*, 567 U.S. at 726 (plurality op.) ("The Government points to no evidence to support its claim that the public's general perception of military awards is diluted by false claims."). Nor is there any evidence that counterspeech—including, for example, substantially increased government transparency—would fail to address the government's stated concerns. *Id.* ("The Government has not shown, and cannot show, why counterspeech would not suffice to achieve its interest.");

*id.* at 738 (opinion of Breyer, J.) ("I would also note, like the plurality, that in this area more accurate information will normally counteract the lie.").

Assuming *arguendo* that the government could muster the necessary evidence, Section 6.14(a) would still fail review under either strict or intermediate scrutiny because it is not remotely tailored to the government's asserted interests in public safety and order. Unlike Section 6.14(a)'s second provision, the first provision does not even require the government to demonstrate that speech falsely predicting a catastrophe resulted in a risk of imminent harm to persons or property. As a result, it criminalizes obviously harmless false alarms about supposedly imminent catastrophes, such as fanciful predictions of an alien invasion. *See SBA List II*, 814 F.3d at 475 (holding that Ohio's false statement law was "not narrowly tailored" to the government's interest in preserving fair elections, because it penalized knowingly false statements about political candidates even if there was no plausible risk that they would influence the election). At the same time, the first provision is significantly underinclusive, because it does not criminalize knowingly false assurances that a catastrophe will *not* materialize, even though false assurances—such as falsely telling the public that COVID-19 is a hoax and that there is no need to take precautions to prevent transmission—can pose just as much of a threat to public safety as false alarms. *See Reed*, 576 U.S. at 172 ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." (citation and internal quotation marks omitted)).

> **D.  Plaintiffs are likely to succeed in demonstrating that Section 6.14(a)'s second provision is unconstitutional.**

Section 6.14(a)'s second provision fares no better. This provision makes it a crime to "disseminate, publish, transmit, transfer and/or circulate through any means of communication,

including the means of television media, social network, and/or any other means of dissemination, publication or distribution of information, a notice or a false alarm, knowing that the information is false," if a "result" of the speech "puts the life, health, bodily integrity or safety of one or more persons at imminent risk, or endangers public or private property." Unlike Section 6.14(a)'s first provision, the second provision is not limited to false reports of an imminent catastrophe. It therefore gives the government broad authority to prosecute perceived lies during a declared emergency based on nothing more than an inherently subjective assessment about whether the speech resulted in a "risk" of harm to persons or property.

The dangers of allowing the government to prosecute speech about matters of public concern on the basis of its potential to create public unrest are well established. First, criminalizing protected speech based on the government's projections about how people might react creates obvious vagueness problems because it fails to provide adequate notice about what speech is prohibited and invites arbitrary, selective, or discriminatory enforcement. Thus, in *Ashton v. Kentucky*, 384 U.S. 195 (1966), the Supreme Court reversed a criminal defamation conviction because the state's definition of criminal defamation—false and defamatory statements calculated to cause a breach of the peace—was unconstitutionally vague. The Court explained that this definition left "wide open the standard of responsibility," because it predicated criminal liability on the government's assessment of "the boiling point of a particular person or a particular group, not an appraisal of the nature of the comments per se." *Id.* at 200.

Relatedly, criminalizing protected speech on the basis of its perceived potential to cause disruption amounts to "an unconstitutional 'heckler's veto'" because it "allows or disallows protected speech based merely on the audience's reaction to its content." *March v. Frey*, — F. Supp. 3d —, No. 2:15-CV-515-NT, 2020 WL 2044625, at *12 (D. Me. Apr. 28, 2020) (citing

*Bachellar v. Maryland*, 397 U.S. 564, 567 (1970)); *see also, e.g.*, *Bible Believers v. Wayne Cty.,*
*Mich.*, 805 F.3d 228, 252 (6th Cir. 2015) (en banc) ("If the speaker's message does not fall into
one of the recognized categories of unprotected speech, the message does not lose its protection
under the First Amendment due to the lawless reaction of those who hear it." (footnote omitted)).
"Indeed, a speech burden based on audience reactions is simply government hostility and
intervention in a different guise. The speech is targeted, after all, based on the government's
disapproval of the speaker's choice of message. And it is the government itself that is attempting
in this case to decide" how the audience would likely react. *Matal*, 137 S. Ct. at 1767 (opinion of
Kennedy, J.). In other words, when the government penalizes protected speech on the basis of its
own forecasts about how the public might react, it is just laundering its own content and
viewpoint discrimination.

Even if Section 6.14(a)'s second provision were evaluated under intermediate First
Amendment scrutiny as an overbroad restriction on protected expression, however, it would still
fail judicial review. *See Alvarez*, 567 U.S. at 730–39 (opinion of Breyer, J.) (holding that the
Stolen Valor Act failed intermediate First Amendment scrutiny because it was not narrowly
tailored to the government's interest in preserving the integrity of military honors). Section
6.14(a)'s second provision is not narrowly defined in terms of subject matter. It does not require
the government to demonstrate that the defendant actually foresaw that their speech would cause
a risk of imminent harm to persons or property. It does not describe how great the risk needs to
be in terms of either likelihood or severity. And it does not require the government to show that
significant public harm actually resulted. Section 6.14(a) thus "ranges very broadly[,] [a]nd that
breadth means that it creates a significant risk of First Amendment harm." *Alvarez*, 567 U.S. at
736 (2012) (opinion of Breyer, J.). The risk of First Amendment harm is especially significant

because Section 6.14(a) applies to speech on political issues, such as speech about government emergency orders, "where although . . . lies are more likely to cause harm, the risk of censorious selectivity by prosecutors is also high." *Id.*

The Federal Communications Commission's broadcast hoaxes rule, 47 C.F.R. § 73.1217, provides an example of a regulation more narrowly tailored to the Government's asserted interest in preventing false information from threatening public safety. The rule states:

> No licensee or permittee of any broadcast station shall broadcast false information concerning a crime or a catastrophe if:
>
> (a) The licensee knows this information is false;
>
> (b) It is foreseeable that broadcast of the information will cause substantial public harm, and
>
> (c) Broadcast of the information does in fact directly cause substantial public harm.
>
> . . .
>
> For purposes of this rule, "public harm" must begin immediately, and cause direct and actual damage to property or to the health or safety of the general public, or diversion of law enforcement or other public health and safety authorities from their duties. The public harm will be deemed foreseeable if the licensee could expect with a significant degree of certainty that public harm would occur. A "crime" is any act or omission that makes the offender subject to criminal punishment by law. A "catastrophe" is a disaster or imminent disaster involving [a] violent or sudden event affecting the public.

*Id.*

Unlike Section 6.14(a), the FCC's broadcast hoaxes rule requires the government to demonstrate that: (1) the false information "concern[s] a crime or a catastrophe," both of which are expressly defined; (2) public harm "beg[a]n immediately" as a result of the broadcast of the false information; and (3) the broadcaster could have "expect[ed] with a significant degree of certainty that public harm would occur." *Id.* The FCC has made clear that these strict limitations on the scope of the broadcast hoaxes rule are essential to address the "substantial First Amendment concerns involved with the federal government policing the content of broadcast

news." Federal Communications Commission, *Letter to Jessica J. González Re: Free Press Emergency Petition for Inquiry Into Broadcast of False Information on COVID-19*, No. DA 20-385, 2020 WL 1686747, at *2 (OHMSV Apr. 6, 2020) (citing *Alvarez*, 567 U.S. at 716 (plurality opinion)).

Those same concerns militate against Section 6.14's substantially overbroad attempt to police public discourse about emergency conditions in Puerto Rico, such as the COVID-19 public health crisis. As the FCC explained in rejecting a request to extend the broadcast hoax rule beyond its narrowly established confines, the news media "face[s] the challenge of covering a rapidly-evolving, national, and international health crisis, in which new information—much of it medical or technical in nature and therefore difficult to corroborate or refute in real time—is continually revealed, vetted, and verified or dismissed." *Id.* Under these complex, evolving, and politically charged circumstances, laws that broadly criminalize false statements about emergency conditions give the government too much power over public discourse and chill too much reporting on matters of public concern.

## II.   Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Since Plaintiffs "have made a strong showing of likelihood of success on the merits of their First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well." *Sindicato Puertorriqueño de Trabajadores*, 699 F.3d at 15. Although Section 6.14(a) has not yet been enforced against Plaintiffs, the threat of prosecution under the statute will chill both Plaintiffs and their sources. *See* Second Rodríguez Cotto Decl. ¶¶ 8–9; Second González Cotto Decl. ¶¶ 8–9. *See also Mangual*, 317 F.3d at 58 ("[T]here is nothing

Mangual can do to limit his exposure other than to curtail his investigative and journalistic activities.").

Furthermore, even if Plaintiffs and their sources were not in immediate danger of being chilled by the threat of prosecution, the risk that they *might* eventually succumb to the pressure exerted by the statute during the pendency of this litigation would itself suffice to establish irreparable injury. *See Elrod*, 427 U.S. at 373 (holding that the plaintiffs had demonstrated irreparable harm because "First Amendment interests were *either threatened or in fact being impaired* at the time relief was sought." (emphasis added)). The chilling effect threatened by Section 6.14(a) is particularly significant in this case because it concerns time-sensitive information on matters of immense public concern. It is impossible to ascertain how much the chill caused by Section 6.14(a) will distort public discussion about issues central to democratic self-governance during the COVID-19 public health crisis.

## III.   The Balance of Hardships and the Public Interest

As this Court recognized in *Firecross Ministries v. Municipality of Ponce*, the balance of hardships and the public interest "weigh[] heavily against Defendants" in any case where a plaintiff demonstrates a likelihood of success on the merits of free speech claims, because "First Amendment freedoms must always be protected" and "suppressing protected speech innately harms the public interest as a whole." 204 F. Supp. 2d 244, 250–51 (D.P.R. 2002). Thus, in any First Amendment case where a plaintiff demonstrates a likelihood of success on the merits, the "balance weighs heavily against Defendants." *Id.* at 251. *See also, e.g.*, *Magriz v. Union de Tronquistas de P.R., Local 901*, 765 F. Supp. 2d 143, 157 (D.P.R. 2011) ("When a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public to prevent violation of a party's constitutional rights." (quoting *Miller v.*

*City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010))). These presumptions carry special force when press freedoms are at stake, because "[a] broadly defined freedom of the press assures the maintenance of our political system and an open society." *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967).

Plaintiffs do not dispute that the government has a legitimate interest in public safety. But the First Amendment rights to free speech and a free press promote, rather than undermine, public safety. "The Framers of the First Amendment, fully aware of both the need to defend a new nation and the abuses of the English and Colonial Governments, sought to give this new society strength and security by providing that freedom of speech, press, religion, and assembly should not be abridged." *N.Y. Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring). As discussed in Sections I.C and I.D, *supra*, Section 6.14(a) criminalizes far more protected speech on matters of public concern than necessary to protect public safety. The government should not be allowed to invoke vague concerns about "security" as a free pass to run roughshod over the fundamental freedoms enshrined in the First Amendment.

## IV.    The Court Should Waive Any Bond Requirement Under Rule 65(c).

Finally, Plaintiffs respectfully request that this Court waive any bond requirement under Rule 65(c). Waiving the bond requirement is warranted because Plaintiffs seek to vindicate constitutional rights, and so their lawsuit is in the public interest. *See Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*, 679 F.2d 978, 1000 (1st Cir. 1982) ("[N]o bond is required in suits to enforce important federal rights or public interests." (internal quotation marks omitted)), *rev'd on other grounds*, 467 U.S. 526 (1984); *see also, e.g.*, *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 803 n.8 (3d Cir. 1989) (collecting cases); *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d

1084, 1094 (5th Cir. 1981) (noting that courts have recognized that public interest litigation is an exception to the Rule 65 bond requirement).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction prohibiting the government from enforcing Section 6.14(a). Plaintiffs also respectfully request that the Court waive any bond requirement under Federal Rule of Civil Procedure 65(c).

I HEREBY CERTIFY that the undersigned attorney electronically filed the foregoing with the Clerk of the Court, which will send notification of such filing to the parties subscribing to the CM/ECF System.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 29th day of July 2020.

S/Fermín L. Arraiza-Navas
FERMÍN L. ARRAIZA NAVAS
USDC-PR No. 215705
William Ramírez-Hernández+
Executive Director
American Civil Liberties Union
of Puerto Rico
Union Plaza, 416 Ponce de León, Suite 1105
San Juan, Puerto Rico 00918
(787) 753-9493
(646) 740-3865
farraiza@aclu.org

Brian Hauss*
Emerson Sykes+
Arianna Demas+
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
bhauss@aclu.org
*Pro hac vice
+ Of counsel

Attorneys for Plaintiffs