# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

SANDRA RODRÍGUEZ COTTO;
RAFELLI GONZÁLEZ COTTO,

    *Plaintiffs*,

  v.

WANDA VÁZQUEZ GARCED, Governor of Puerto Rico; INÉS DEL C. CARRAU-MARTÍNEZ, Interim Secretary of Department of Justice of Puerto Rico; PEDRO JANER, Secretary of Puerto Rico Department of Public Safety; HENRY ESCALERA, Puerto Rico Police Commissioner, all in their official capacities,

    *Defendants*.

Civil Action No.: 3:20-01235-PAD

### BRIEF OF *AMICI CURIAE*
### PEN AMERICA AND UGA SCHOOL OF LAW's FIRST AMENDMENT CLINIC
### IN SUPPORT OF PLAINTIFFS' RENEWED MOTION
### FOR PRELIMINARY INJUNCTION

1

## INTERESTS OF *AMICUS CURIAE*

PEN American Center, Inc. ("PEN America" or "PEN") is a nonprofit organization that represents and advocates for the interests of writers, both in the United States and abroad. PEN America is affiliated with more than 100 centers worldwide that comprise the PEN International network. Its Membership includes more than 7,400 journalists, novelists, poets, essayists, and other members of the media. PEN America stands at the intersection of journalism, literature, and human rights to protect free expression and individual writers facing threats for their speech. PEN America has a particular interest in opposing censorship schemes in all forms that inhibit creative and free expression. PEN champions the freedom of people everywhere to write, create literature, convey information and ideas, and express their views, recognizing the power of the word to transform the world. PEN America supports the First Amendment and free expression rights of members of the media to produce works of national and local import and of readers to receive their unique perspective unfettered by government censorship.

The University of Georgia School of Law's First Amendment Clinic ("First Amendment Clinic" or "Clinic"), located in Athens, Georgia, defends and advances freedoms of speech and the press through direct client representation and advocacy on behalf of journalists, students, government employees, and public citizens. Training law students to be leaders on First Amendment issues as litigators and community educators, the Clinic's work promotes free expression, newsgathering, and the creation of a more informed citizenry. The Clinic has a particular interest in safeguarding news reporting that aims to educate the general population regarding public affairs and thereby increase government accountability to its electorate. The Clinic is further committed to the ability of the press and the people to freely exchange information and ideas on matters of public concern without fear of reprisal by state actors.

## INTRODUCTION

PEN America and the First Amendment Clinic respectfully file this *amici curiae* brief in support of Plaintiffs Sandra Rodriguez Cotto and Rafelli Gonzalez Cotto's Renewed Motion for Preliminary Injunction. The motion seeks to stop enforcement of Section 6.14 of Puerto Rico's Department of Public Safety Act 66-2020, which criminalizes the dissemination of false information about conditions in Puerto Rico during a state-declared emergency or disaster.

Overly broad, vague, and inviting prosecutions based on unfettered discretion, Section 6.14 will inevitably chill speech -- including truthful reporting -- by journalists, news publishers, and their sources during times of crisis. This is precisely when investigative reporting is most essential to maintaining the free flow of information, ideas, and opinions to the public and assuring that the government is held accountable for its actions. Section 6.14 not only invades press freedoms but also heavily burdens the public's First Amendment interest in receiving information about matters of public concern. In turn, this diminishes citizens' ability to meaningfully exercise their own rights of speech and political freedom. *See Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936) ("informed public opinion is the most potent of all restraints upon misgovernment"). We know that international statutes which criminalize false or misleading news become tools for suppressing legitimate reporting. This reality, coupled with the standard-less language of Section 6.14, set forth in an Act that targets "mass media," presents a palpable threat to press freedom and the First Amendment which must be enjoined by this court.

## ARGUMENT

**I.  Section 6.14(a) is Overly Broad, Impermissibly Vague, and Invites the Exercise of Unfettered Government Discretion.**

Overly broad and vaguely worded, Puerto Rico's Act 66-2020, Section 6.14(a), criminalizes speech -- and the publication or dissemination thereof -- if it contains false information during times of state-declared emergency or disaster. Explicitly targeted at "mass media" per the Act's Statement of Purpose, the statue puts journalists, publishers, and their sources squarely in the cross-hairs for prosecution as they work to keep the public informed amid quickly evolving circumstances where the known facts are rapidly changing and where honest mistakes will inevitably be made. Further, the nebulous language of Section 6.14(a) affords law enforcement unfettered discretion in deciding which purveyors of allegedly false information to prosecute, creating a powerful tool for punishing speech that criticizes or embarrasses government officials, or runs counter to official government narratives. Such broad discretion on the part of government to retaliate against its critics is particularly chilling to members of the press and their publishers who serve the essential role of shining light on state action, including governmental ineptitude, corruption or abuse. This watchdog function is never more vital than during a large-scale crisis. Yet it is exclusively during such times that hard-hitting investigative journalism stands to be sanctioned and suppressed under Section 6.14(a), according to the plain language of Act 66-2020. Finally, the statute's overly broad, vague and discretionary reach intrudes far too dangerously on "delicate and vulnerable" First Amendment interests that are "supremely precious in our society," depriving those interests of the "need[ed] breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Section 1.14(a) imposes six months' jail time and/or a $5,000 fine -- with even more severe penalties available under certain factual circumstances -- for engaging in any of the following expressive activity while a Governor's Executive Order declaring an emergency or disaster is in effect:

> Giv[ing] a warning or false alarm, knowing that the information is false, in relation to the imminent occurrence of a catastrophe in Puerto Rico,
>
> or
>
> [D]isseminat[ing], publish[ing], transmit[ting], transfer[ing] and/or circulat[ing] through any means of communication, including the means of television media, social network, and/or any other means of dissemination, publication or distribution of information, a notice or a false alarm, knowing that the information is false, when as a result of their conduct it puts the life, health, bodily integrity or safety of one or more persons at imminent risk, or endangers public or private property.

The "knowing" scienter requirement that appears in both provisions of Section 6.14(a) does not remedy the law's constitutional infirmities. As an initial matter, there is no requirement under either provision that the false information be material, rendering even minor inaccuracies subject to full criminal prosecution. *See Mangual v. Rotger-Sabat*, 317 F.3d 45, 68 (1st Cir. 2003) (noting, in the context of a criminal libel statute, the importance of requiring that a prosecuted falsehood result in a "material change in meaning" so as to avoid liability for "small inaccuracies"). *Compare Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (in the civil libel context, "[m]inor inaccuracies do not amount to falsity" under the "actual malice" standard for knowing or reckless false statements).

Further, the leading provision of Section 6.14(a) prohibits giving "a warning or false alarm" that contains false information "in relation to the imminent occurrence of a catastrophe." But the statute contains no guardrails for either the kind of "warning or false alarm" that will trigger prosecution or what is meant by "catastrophe." As such, a person could be criminally charged for fantastical, apocryphal, or even just hyperbolic speech (e.g., claims that aliens will invade the Earth tomorrow, that the world will end next Tuesday, or that World War III is about

5

to start) that no reasonable person would take literally and that serves no compelling governmental purpose to punish. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.").[1]

Section 6.14(a) provides no definition or guiding principles for the requisite severity, duration, or number of people affected to constitute a "catastrophe" within the meaning of the statute, leaving it to the personal discretion of government actors to decide when a portended event reaches this prosecutable level. Further, what may be truly "catastrophic" in an individual sense (i.e., a house fire, the death of a family member) may not rise to the level of a public "catastrophe," but the statute does not differentiate in scale. Law enforcement officials are therefore left to make subjective and wholly discretionary decisions about when a warned or alarmed event constitutes a "catastrophe" so as to trigger application of the statute. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983) ("the void-for-vagueness doctrine requires that a penal statute define the criminal offense . . . in a manner that does not encourage arbitrary and discriminatory enforcement"); *Smith v. Goguen,* 415 U.S. 566, 573 (1974) ("Where a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."). Indeed, the Supreme Court has clarified that "the requirement that a legislature establish minimal guidelines to govern law enforcement" is "the more important aspect" of the void-for-vagueness doctrine, although the doctrine also exists to ensure that criminal offenses are defined "with

---

[1] Similarly, religious speech would be implicated for prosecution under the leading provision of Section 6.14(a), such as where, after a state of emergency has been declared, an individual warns that cataclysmic events (e.g., earthquakes, hurricanes, volcanic eruptions, tsunamis) will imminently occur as God's punishment for the world's sins.

6

sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender*, 461 U.S. at 357-58 (quoting. *Goguen,* 415 U.S. at 574).

Meanwhile, the scienter requirement in Section 6.14(a) also fails to salvage the statute's second provision which outlaws speech -- and publication or dissemination thereof by a litany of possible methods -- if it consists of "a notice or false alarm" containing knowingly false information. Unfortunately, this does not shield journalists, publishers, or their sources who criticize the government or other powerful actors with influence in law enforcement from still being erroneously accused of knowingly communicating false information. *See*, *e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014) (in First Amendment challenge to law prohibiting false statements about political candidates, plaintiff's insistence that it had engaged in truthful speech in the past, and plaintiff's lack of declared intent to engage in false speech in the future, did not insulate plaintiff from future risk of being accused of false statements where plaintiff declared intent to continue critiquing political candidates and their voting records); *Frese v. McDonald*, 425 F.Supp.3d 64, 74-76 (D.N.H. 2019) (even absent declared intent to knowingly communicate false information, Frese still "demonstrated that his intended future conduct is 'arguably ... proscribed by the [state's criminal libel] statute'" because the statute "sweeps broadly, carving out no exceptions for speech concerning law enforcement or other public officials" and Frese intended to continue engaging in speech critical of law enforcement) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Medical, public health, and scientific knowledge rapidly evolves in times of crisis, most recently seen in the COVID-19 responses by governments around the world as they have struggled to contain the pandemic. During such times, there may be conflicting information about what constitutes the objective facts of a situation; such in-flux, crisis circumstances --

7

which is explicitly when Section 6.14(a) applies -- heighten the risk that a journalist, publisher, or their source will be accused of having "known" information to be false at the time it was communicated even though the individual or entity did not know, or made an honest mistake, or reasonable people could disagree as to whether the information was actually false based on conflicting information. *See Babbitt*, 442 U.S. at 301 ("Although appellees do not plan to propagate untruths, they contend—as we have observed—that 'erroneous statement is inevitable in free debate.'") (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964)).

That prosecution of journalists, news publishers, and their sources may ultimately fail under Section 6.14(a) where their knowledge of falsity cannot be proven does nothing to cure the First Amendment harm visited on them by still having to risk or undergo the time-consuming, expensive, and stressful experience of defending against criminal charges and undergoing the risk (or worse, the reality) of a wrongful conviction. *See Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965) ("So long as the statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one. Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression."); *Button*, 371 U.S. at 433 (noting that where there exists "a penal statute susceptible of sweeping and improper application" in the area of First Amendment freedoms, "[t]he threat of sanctions may deter their exercise almost as potently as the actual application of sanctions").

At least one prosecution under an earlier version of Section 6.14(a) has already been brought in 2020: while ultimately dismissed by a court for lack of probable cause, it subjected the target (Pastor José Luis Rivera Santiago) to the chilling experience of defending against a criminal charge for having disseminated an advance warning -- that proved true -- about a rumored executive order that would close most businesses due to the COVID-19 pandemic. *See*

*Rodriguez Cotto* Amended Complaint ¶ 24. This illustrates how Section 6.14(a), irrespective of its revisions, creates a credible threat of prosecution for reporters and news media working during a national emergency to inform the public about developing situations and government responses. *See Mangual*, 317 F.3d at 57 (noting that the evidentiary bar for whether a First Amendment plaintiff faces a "credible threat" of prosecution "is extremely low," and that "a finding of no credible threat of prosecution under a criminal statute requires a long institutional history of disuse [of the statute], bordering on desuetude"). As Section 6.14(a) was enacted and amended only this year (i.e., 2020), has already been attempted to be enforced at least once without probable cause, and contains no carve-out provision for news, media, or the press, it presents a "credible threat" of prosecution to all journalists in Puerto Rico reporting about a Governor-declared emergency or disaster. *See id.* at 59 (recognizing merit of First Amendment challenge to Puerto Rico's criminal libel statute and holding that "[t]he [reporter] plaintiff's credible fear of being ha[u]led into court on a criminal charge is enough for the purposes of standing, even if it were not likely that the reporter would be convicted").

Moreover, criminal liability arises under the second provision of Section 6.14(a) for anyone who "disseminat[es], publish[es], transmit[s], transfer[s] and/or circulat[es] through any means of communication . . . a notice or a false alarm, knowing that the information is false, *when as a result of their conduct it puts the life, health, bodily integrity or safety of one or more persons <u>at imminent risk</u>, or endangers public or private property*." (Emphasis added.) This means liability turns on the consequence of the speech -- i.e. how others react to it -- even when such consequence was not intended by the speaker, nor reasonably foreseeable at the time of the speech. Thus, it is impossible for a journalist, publisher, or source who wishes to avoid risk of prosecution under the second provision of Section 6.14(a) to know what speech or publication to

9

censor. The court in *Frese* identified the First Amendment danger arising from such a circumstance. There, the challenged criminal libel statute created liability for any person who knowingly communicated false information "know[ing] it will tend to expose any other living person to public hatred, contempt or ridicule." 425 F.Supp.3d at 69-70 (emphasis added). The court held that, notwithstanding the "knowingly false" scienter requirement, the statute still posed a threat of unconstitutional chill on First Amendment activity because "exactly what speech a person knows will 'tend to expose any other living person to public hatred, contempt or ridicule' may not be so easily determined in a diverse, pluralistic nation." *Id*. at 80. Likewise, what speech will result in "imminent risk" to "the life, health, bodily integrity or safety of one or more persons" or "endanger[ment]" of public or private property may not be so easily foreseen or predicted during a rapidly evolving emergency or disaster involving complexities of medicine, science, and public health. More concerning still, there is no requirement in the second provision of Section 6.14(a) that any actual harm result from the prosecuted speech since the statute specifies only that there be "imminent risk" of harm or endangerment of property. Finally, Section 6.14(a) articulates no limiting principles for what level of "risk" or "endanger[ment]" triggers liability under the statute, since "imminent" refers only to the temporal proximity between the speech or publication and the alleged risk, not to the degree of that risk. This again leaves to the unfettered discretion of law enforcement the determination of whether sufficient "risk" or "endanger[ment]" has resulted from allegedly false speech or publication to warrant arresting and charging the speaker under Section 6.14(a). Such untethered discretion invites law enforcement to engage in viewpoint discrimination, based on dislike for either the speaker/publisher or their message, in determining who will be prosecuted. *See Kolender*, 461 U.S. at 358 (noting that where a legislature fails to provide non-discretionary guidelines for

10

enforcement, "a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'") (quoting *Goguen,* 415 U.S. at 575). *Cf. Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (ordinance struck down under First Amendment where the ability to engage in constitutionally protected speech becomes "contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official").

The foregoing dangers of overbreadth, vagueness, and unfettered discretion present in the current drafting of Section 6.14(a) collectively make it virtually impossible to predict which speech or publication will be deemed false and, thus, subject to prosecution. Accordingly, journalists, publishers, and their sources wishing to avoid arrest or prosecution will necessarily refrain from contributing to the public debate on any number of matters of public concern during a state-declared emergency or disaster, including criticizing the government or speaking counter to government narratives. *See N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996) (cognizable First Amendment injury arises when a plaintiff "is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences"); *see also Babbitt*, 442 U.S. at 301-02 (finding that even where challenged statue proscribing "dishonest, untruthful, and deceptive [consumer] publicity" had not yet and may never be applied to the plaintiff labor union, "a case or controversy" still existed because the union was "not without some reason in fearing prosecution" under the statute and had "submit[ted] that to avoid criminal prosecution [the union] must curtail their consumer appeals, and thus forgo full exercise" of their First Amendment rights); *Mangual*, 317 F.3d at 58 (chilling effect of criminal libel statute on journalist, and likely his sources as well, affords him standing

since "there is nothing Mangual can do to limit his exposure other than to curtail his investigative and journalistic activities").

Self-censorship by journalists, publishers, and their sources in the face of potential prosecution under Section 6.14(a) cripples First Amendment rights in Puerto Rico for members of the media as well as for the public who have a well-established First Amendment interest in receiving information and who necessarily rely on investigative reporting and the news to keep them informed.

## II. Section 6.14(a) Suppresses Legitimate, Newsworthy Speech and Undermines the Public's Right to Know.

Section 6.14(a) chills speech and publication by, without limitation, journalists, publishers, and their sources who are, in fact, most needed during times of emergency and disaster to keep the public informed. In so doing, Section 6.14(a) not only dangerously tramples press freedoms but also heavily burdens the First Amendment interest of the public in receiving information about matters of public concern.

### A. Section 6.14(a) impermissibly legislates newsgathering and downgrades a free press to report only as the government sees fit.

While neither Plaintiffs nor *amici* are in favor of intentionally false statements by journalists or anyone else, as a matter of law, such statements are generally protected by the First Amendment. *See United States v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality opinion) ("Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements."). Moreover, by criminalizing the communication of knowingly false statements, including by the press, during times of state-declared emergency or disaster, Section 6.14(a) in effect legislates journalistic ethics, setting up a

vehicle for the government to criminalize legitimate speech it disfavors under the vague contours of the statute's language.

The Supreme Court has previously declared attempts to enforce journalistic standards and ethics through criminal penalties to be unconstitutional. *See, e.g., Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 243, 256-58 (1974) (First Amendment rights of news editors violated by a statute that required newspapers, on pain of criminal penalty, to give political candidates a right to reply to criticism lodged against them by the paper; "[a] responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated"). *See also Craig v. Harney*, 331 U.S. 367, 369, 374-75 (1947) (First Amendment violation to hold reporters in criminal contempt for their commentary about a court proceeding even though "[the articles] did not reflect good reporting" and contained inaccuracies). Similar to the foregoing attempts to punish sub-par journalism or to mandate balanced news reporting that the Supreme Court invalidated, sanctioning allegedly false statements contained in news reporting impermissibly intrudes on journalistic and editorial speech, and that the First Amendment does not tolerate.

Moreover, international statutes that criminalize false or misleading information illuminate that these laws often become tools for suppressing legitimate speech and for censoring newsgathering. More than fifteen countries have enacted such laws, many with devastating consequences to press freedoms. *See* Daniel Funke, Daniela Flamini, *A guide to anti-misinformation actions around the world*, Poynter, https://www.poynter.org/ifcn/anti-misinformation-actions/ (last visited August 12, 2020). With the passage of Section 6.14(a) of Act 66-2020, Puerto Rico is now following in the footsteps of Egypt, Singapore, Morocco, and China, all of which have weaponized "fake news" laws to target critical reporting.

13

In Egypt, the government passed a law that allows authorities to target purveyors of false news with sanctions, criminal charges, and even jail. Repeated examples of the statute's use shows that it has been deployed to target reporters and political dissidents. Since 2018, Egypt has blocked or suspended five hundred websites and even detained and charged Adel Sabri, Editor-in-Chief of the Masr El-Arabiya website, with dissemination of false news. The news website was subsequently fined $2,855. George Sadek, *Initiatives to Counter Fake News: Egypt*, Library of Congress (April 2019), https://www.loc.gov/law/help/fake-news/egypt.php. Authorities have also used the law to target non-journalist dissidents: A human rights activist was sentenced to two years in prison and a $560 fine after criticizing the government's handling of sexual assault, and an author who challenged the country's economic policy was also arrested and questioned for seven hours. BBC, *Egypt sentences activist for 'spreading fake news'* (Sept. 29, 2018), https://www.bbc.com/news/world-middle-east-45691770; Hamza Hendawi, *Egypt arrests author, publisher over book on economy*, The Associated Press (Oct. 23, 2018), https://apnews.com/de0495a5cef14799b12402b2f1802e50. Perhaps the most egregious: an Egyptian journalist was jailed on fake news charges and later died after contracting COVID-19 in pre-trial detention. *Egyptian journalist jailed on fake news charges dies of Covid-19* (Jul. 14, 2020), The Guardian, https://www.theguardian.com/world/2020/jul/14/ egyptian-journalist-jailed-on-fake-news-charges-dies-of-covid-19-mohamed-monir.

Other international examples further illustrate how "fake news" laws easily become vehicles to suppress legitimate speech. In March 2020, amid the COVID-19 pandemic, the Moroccan government also approved a law that criminalized spreading "false news" and rumors relating to the pandemic. The same day, the police made a dozen arrests under the law's authority, including one of a woman who used her YouTube channel to say the disease did not

14

exist. Reuters, *Morocco makes a dozen arrests over coronavirus fake news* (Mar. 19, 2020, 9:45 AM), https://www.reuters.com/article/us-health-coronavirus-morocco/ morocco- makes-a-dozen-arrests-over-coronavirus-fake-news-idUSKBN2162DI. The woman was subsequently sentenced to one year in prison and since then, eighty-one other individuals have been arrested under similar fake-news charges. Taha Mebtoul, *Moroccan Woman Handed 1 Year in Prison for COVID-Related Fake News*, Morocco World News (Apr. 17, 2020), https://www.moroccoworldnews.com/2020/04/299867/moroccan-woman-handed-1-year-in-prison-for-covid-related-fake-news/.

Plaintiff Rodríguez Cotto faced a similar experience when she uncovered the Puerto Rican government's underreporting of deaths from Hurricane María in 2017, forcing her to revise the death toll from dozens to thousands of deaths. Plaintiff's Amended Complaint, ¶ 44 - 45. She has identified similar information lacunae during the COVID-19 crisis. Overly broad statutes such as Section 6.14(a) threaten to exacerbate uncertainty in times when certainty is needed most, and give law enforcement "nearly unfettered discretion to apply their own standards." Amended Complaint, ¶ 63.

### B. Section 6.14(a) threatens the free flow of information to the public.

It is undisputed that the First Amendment protects the right, not only to speak, but also to *receive* the speech of others. *See Board of Education v. Pico*, 457 U.S. 853, 867 (1982) ("[The right to receive information and ideas] is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution."); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the [First Amendment] protects the right to receive information and ideas."). Relatedly, the Supreme Court has consistently emphasized a First Amendment interest in the free flow of information and ideas to the public. *See Hustler*

*Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988) ("At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern."); *Garrison v. State of La.*, 379 U.S. 64, 77 (1964) (recognizing the "paramount public interest in a free flow of information to the people"). These cases establish that when the state violates the rights of speakers, it necessarily also infringes the First Amendment rights of their audience. Thus, when journalists, publishers, and their sources self-censor during emergencies or disasters in order to avoid risk of prosecution pursuant to Section 6.14(a), the public's First Amendment interests suffer in direct proportion to the amount of speech being suppressed.

Applying this principle to facts similar to those at bar, the district court in *Fitts v. Kolb*, 779 F.Supp. 1502 (D.S.C. 1991), struck down South Carolina's criminal libel statute which, like Section 6.14(a), criminalized originating, circulating or publishing false information. Recognizing that the libel statute impacted not only disseminators of speech, but recipients as well, the court emphasized that "the threat of prosecution chills the freedom of speech of the speakers and thus reduces the amount of information and the range of opinion and viewpoint available for the readers to receive." *Id.* at 1510.

The right to receive information about public affairs and the actions or inaction of government is essential to the people's ability to meaningfully exercise their own free speech rights and to engage in the political process in an informed manner. *See Pico*, 457 U.S. at 867 ("the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom") (emphasis in original); *see also Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 585 (1983) ("an informed public is the essence of working democracy"); *Mills v. Alabama*, 384 U.S. 214, 218 (1966)

("there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs"); *Garrison*, 379 U.S. at 74-75 ("speech concerning public affairs is more than self-expression; it is the essence of self-government"). Moreover, the First Amendment's protection of the free flow of information to the public ensures that those discussions of public issues are "uninhibited, robust, and wide-open." *New York Times*, 376 U.S. at 270. *See also Stromberg v. California*, 283 U.S. 359, 369 (1931) ("The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people . . . is a fundamental principle of our constitutional system.").

A free press performs the essential function of informing the public about what their government is doing (or not doing). *See Grosjean*, 297 U.S. at 250; *Riley v. City of Chester*, 612 F.2d 708, 714 (3rd Cir. 1979). Indeed, "an untrammeled press" is an essential source of public information, with "newspapers, magazines, and other journals of the country . . . hav[ing] shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity." *Grosjean*, 297 U.S. at 250. Because "informed public opinion is the most potent of all restraints upon misgovernment," the Court emphasized that suppression or abridgement of a free press presents "grave concern." *Id*.

As *Grosjean* and subsequent cases recognize, without a free and unrestrained press to gather and disseminate information about government affairs, citizens would largely be left in the dark unable to check ineptitude, corruption or abuse. This is precisely the danger the First Amendment exists to protect against as "[o]nly a free and unrestrained press can effectively expose deception in government. And paramount among the responsibilities of a free press is the duty to prevent any part of the government from deceiving the people." *New York Times Co. v. U.S.*, 403 U.S. 713, 717 (1971) (Blackman, J., concurring). *Accord Minneapolis Star*, 460 U.S. at

585 ("[T]he basic assumption of our political system [is] that the press will often serve as an important restraint on government."). Succinctly stated, "A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves." *Grosjean*, 297 U.S. at 250.

The chilling effect of Section 6.14(a) seriously impedes the ability of the press to perform its "essential role" of informing the public, *Riley*, 612 F.2d at 714, and does so specifically during times of emergency and crisis which is precisely when the public's need for information is at its greatest. This, in turn, inhibits the free flow of information upon which the public relies in exercising their own First Amendment rights and significantly hinders their ability to hold their government accountable or to bring about lawful change. The impact of Section 6.14(a) therefore reaches far beyond violating the First Amendment rights of the individually named plaintiff journalists in this case but also deeply impoverishes the First Amendment interests of the public at large. Section 6.14(a) should therefore be struck down as it not only threatens press freedoms but more broadly threatens the heart of the democratic process itself.

## CONCLUSION

The Court should declare that Section 6.14(a) violates the First and Fourteenth Amendments to the United States Constitution, both on its face and as applied to Plaintiffs and enjoin Defendants from enforcing it.

**We Certify** that this Brief is being filed Jointly with the Motion For Leave through the CM/ECF System which will notify parties through their counsel of record .

Dated: August 13, 2020  
San Juan, Puerto Rico

Respectfully submitted,

S/Nora Vargas Acosta  
Nora Vargas Acosta, Esq.

USDCPR NO.: 201206  
First Federal Building  
Muñoz Rivera Ave. 1056, Suite 1004  
Río Piedras, PR 00927  
Telephone: (787) 751-7485  
nvargasacosta@gmail.com  
*Local counsel for Amici Curiae*

Nora Benavides_____
Nora Benavidez (GA Bar 698687)
PEN AMERICAN CENTER, INC.
588 Broadway, Suite 303
New York, NY 20012
(646) 779-4818
nbenavidez@pen.org
*Counsel for Amici Curiae*

Clare Norins_____
Clare Norins (GA Bar 575364)
UGA FIRST AMENDMENT CLINIC
P.O. Box 388
Athens, Georgia 30603
(706) 542-1419
cnorins@uga.edu
*Counsel for Amici Curiae*